# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL E. SPARKMAN, SR., both individually and as Administrator of the ESTATE OF PAUL E. SPARKMAN, JR.<br>7208 Fish Hatchery Road<br>Frederick, MD 21701 | : <br> : <br> : <br> : <br> : <br> : <br> : |
| Plaintiff | Docket No. 4:24-CV-1338 |
| v. | |
| POTTER COUNTY<br>1 North Main Street<br>Coudersport, PA 16915 | **JURY TRIAL DEMANDED** |
| and | |
| CORRECTIONAL OFFICER<br>RICHARD ZURAWA<br>c/o POTTER COUNTY JAIL<br>102 E. 2nd St.<br>Coudersport, PA 16915 | |
| and | |
| CORRECTIONAL OFFICER<br>JOSHUA ROSENWIE<br>c/o POTTER COUNTY JAIL<br>102 E. 2nd St.<br>Coudersport, PA 16915 | |
| and | |
| CORRECTIONAL OFFICER<br>ADAM RINEHART<br>c/o POTTER COUNTY JAIL | |

102 E. 2nd St.                                    :
Coudersport, PA 16915                             :
                                                  :
    and                                           :
                                                  :
CORRECTIONAL OFFICERS                             :
JOHN/JANE DOES (1–10)                             :
(fictitious)                                      :
c/o Potter County Jail                            :
102 E. 2nd St.                                    :
Coudersport, PA 16915                             :
                                                  :
    and                                           :
                                                  :
CHARLES COLE MEMORIAL                             :
HOSPITAL d/b/a UPMC COLE                          :
1001 E. 2nd St.                                   :
Coudersport, PA 16915                             :
                                                  :
    and                                           :
                                                  :
AARON HILL, MD                                    :
c/o UPMC COLE                                     :
1001 E. 2nd St.                                   :
Coudersport, PA 16915                             :
                                                  :
    and                                           :
                                                  :
VALERIE TINDER, RN                                :
2091 Hickox Ulysses Rd.                           :
Genesee, PA 16923                                 :
                                                  :
    and                                           :
                                                  :
DAWN DOVENSKY, LCSW                               :
5 Academy Hill Road                               :
Coudersport, PA 16915                             :
                                                  :
    and                                           :

| | |
|---|---|
| MEDICAL PROVIDERS | : |
| JOHN/JANE DOES (1–10) | : |
| (fictitious) | : |
| c/o Potter County Jail | : |
| 102 E. 2nd St. | : |
| Coudersport, PA 16915 | : |
| | : |
| Defendants | : |

## COMPLAINT

### THE PARTIES

1.      Plaintiff, Paul E. Sparkman, Sr., is an adult individual residing at 7208 Fish Hatchery Road, Frederick, MD 21701.

2.      On April 30, 2024, Plaintiff was granted Letters of Administration by the Register of Wills Office of Northumberland County, Pennsylvania to act as the Administrator of the Estate of Paul E. Sparkman, Jr., his deceased son ("Sparkman").

3.      Sparkman, born August 13, 1990, hung himself and died on August 11, 2022, while an inmate at Potter County Jail ("PCJ"), a county jail located at 102 East 2nd Street in Coudersport, Pennsylvania.  He was survived by Plaintiff (his father residing at the above-captioned address) and minor son, Axel Hrestak, residing at 48 Lupine Lane, Selinsgrove, PA 17870.

4.      Defendant Potter County ("the County") is a municipality within the Commonwealth of Pennsylvania, located at 1 North Main Street in the Borough of

Coudersport, Pennsylvania.  At all relevant times, the County owned and operated PCJ and employed the Officer Defendants identified below.

5.    Defendant Correctional Officer Richard Zurawa ("CO Zurawa") was, at all relevant times, a Correctional Officer at PCJ, acting under the color of the law and within the course and scope of his employment with the County.

6.    Defendant Correctional Officer Joshua Rosenwie ("CO Rosenwie") was, at all relevant times, a Correctional Officer at PCJ, acting under the color of the law and within the course and scope of his employment with the County.

7.    Defendant Correctional Officer Adam Rinehart ("CO Rinehart") was, at all relevant times, a Correctional Officer at PCJ, acting under the color of the law and within the course and scope of his employment with the County.

8.    Defendant Correctional Officers John/Jane Does (1–10) were correctional officers or supervisors employed by the County to work at PCJ. Plaintiff does not presently know the names of these defendants after conducting a reasonable search, including a review of pre-complaint discovery produced by the County.  Plaintiff expects to learn the names of these additional correctional officers and/or supervisors through formal discovery and will promptly take steps to substitute actual names for these fictious names.[1]

---

[1] The County, CO Zurawa, CO Rosenwie, CO Rinehart, and Correctional Officers John/Jane Does (1–10) are hereinafter collectively referred to as the "Officer Defendants."

9.      Defendant Cole Memorial Hospital d/b/a UPMC Cole ("UPMC Cole") is a Pennsylvania nonprofit corporation with a principal place of business at the above-captioned address and, at all relevant times, was under contract with the County to provide medical care to PCJ prisoners such as Sparkman through its employee and/or agent, Defendant Aaron Hill, M.D.

10.     Defendant Aaron Hill, M.D. ("Dr. Hill") was, at all relevant times, a physician who was working at PCJ and responsible for providing healthcare services to inmates, including performing physicals on newly admitted inmates, acting under the color of state law and within the course and scope of his employment and/or agency with UPMC Cole.

11.     Defendant Valerie Tinder, RN ("Nurse Tinder") was, at all relevant times, a nurse who was working at PCJ and responsible for providing healthcare services to inmates, including performing health screenings, developing and monitoring policies and procedures, and training staff.

12.     Defendant Dawn Dovensky, LCSW ("Counselor Dovensky") was, at all relevant times, a social worker who was working at PCJ and responsible for providing behavioral health counseling services to inmates.

13.     Defendant Medical Providers John/Jane Does (1–10) were doctors, nurses, or other medical providers working at PCJ as employees and/or agents of Potter County.  Plaintiff does not presently know the names of these defendants

after conducting a reasonable search, including a review of pre-complaint

discovery produced by the County.  Plaintiff expects to learn the names of these

additional medical providers through formal discovery and will promptly take

steps to substitute actual names for these fictious names.[2]

14.     At all relevant times, the County and UPMC Cole were acting, or

alternatively failed to act, by and through their employees, agents, and/or

ostensible agents, who were acting within the course and scope of their

employment, agency, and/or ostensible agency.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction of this action over all Defendants pursuant

to 42 U.S.C. § 1983 as well as 28 U.S.C. §§ 1331 and 1332(a).  This Court has

jurisdiction over the pendant state tort law claims pursuant to 28 U.S.C § 1367(a).

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a

substantial part of the events and/or omissions giving rise to Plaintiff's claims took

place here, as did Sparkman's suicide.

---

[2] Defendants UPMC Cole, Dr. Hill, Nurse Tinder, Counselor Dovensky, and
Medical Providers John/Jane Does (1–10) are hereinafter collectively referred to as
the "Medical Defendants."  Plaintiff is asserting, *inter alia*, professional negligence
claims against the Medical Defendants and is filing herewith Certificates of Merit
in accordance with Pennsylvania Rule of Civil Procedure 1042.3 (collectively
attaching the Certificates as Exhibit A hereto).

## FACTUAL BACKGROUND

17.    Well before he hung himself on August 11, 2022, Sparkman's mental

health issues and troubled history were well known to Defendants.

18.    On the first day of his incarceration at PCJ, August 7, 2022, Sparkman

completed an Application for Public Defender Services by which he disclosed that

he suffered from a host of mental health problems, including post-traumatic stress

disorder (PTSD), separation anxiety, ADD, ADHD, bipolar, intermittent explosive

disorder (IED), and depression.  He also revealed that he was presently under the

care of doctors, and added that he was taking multiple medications, including

Wellbutrin (bupropion), Minipress (prazosin), and Remeron (mirtazapine).



19.    The same day, August 7, 2022, Sparkman completed the PCJ's Pre-

Acceptance Qualification Form, signed by a Booking Officer and Law

Enforcement Officer.  Sparkman disclosed that he did not have any Wellbutrin,

which he described as "medication which should be continuously administered or available."

> 7. Are you carrying medication or is there medication which should be continuously administered or available? Y ✓ N ___
> If yes, please specify. DON'T HAVE     WELLBUTRION ,

20.    Likewise, on the Inmate Classification Form that Sparkman completed for the PCJ, which was co-signed by CO Rosenwie, he again revealed that his "Mental/Emotional/Adjustment Needs" included "DEPRESSION/ANXIETY," added that his prescribed medications included Wellbutrin, Remeron, and Minipress, and **specified that he "wish[ed] to meet with the counselor soon."**  As reflected below, Sparkman checked "Yes" for having had prior Psychiatric/Psychological Counseling, but did not explain on the next line of the form and apparently was not required to do so by CO Rosenwie:

> II.    Health
>
> Medial Conditons / Needs: UTI _____
> Family Doctor: N/A
> Mental/Emotional/Adjustment Needs: DEPRESSION /ANXIETY
> Have you had any prior Pschiatric/Psyhological Counseling?  ☑ Yes  ☐ No
> If yes, Explain: _____
> Any Medication Prescribed: WELLBUTRIN , REMRON , mansr-
> Drug/Alcohol use history: N/A
> Do you wish to meet with the counselor soon?  ☑ Yes  ☐ No

21.    The same day, August 7, 2022, Sparkman completed and Correctional Officer Ricky Hurler signed PCJ's "Receiving Screening Form," which also

revealed that Sparkman was presently taking medications for psychiatric disorder—Wellbutrin, Remeron, and Minipress—that "should be continuously administered or available."  On the Brief Jail Mental Health Screen, completed by Sparkman and signed by CO Rosenwie the same day, Sparkman again advised that he was "currently taking" those medications "prescribed . . . by a physician for . . . emotional or mental health problems."  In step with Sparkman's request that day to "meet with the counselor soon," CO Rosenwie referred Sparkman to "Dawn D," who upon information and belief is Counselor Dovensky.

22.    Yet despite Sparkman's specific written request to meet with the counselor soon, despite his revealed mental-health conditions, and despite his disclosure that he was without vital prescription mental health medications, Counselor Dovensky never met with Sparkman (upon information and belief).  Nor upon information and belief did Dr. Hill.

23.    Instead, upon information and belief, the first time that any Medical Defendant met with Sparkman was not until the day before his death, August 10, 2022, at which time Nurse Tinder performed a "Nursing Assessment" in connection with Sparkman's intake at PCJ.  At that time, Sparkman revealed that he was treating with "Dr. Nancy Allen" of New Beginnings, which on its website describes itself as a "team of seasoned health and mental health professionals," and provided Nurse Tinder with contact information for Dr. Allen and New Beginnings.

9

24.    At New Beginnings, prior to his incarceration at PCJ, Sparkman had been diagnosed in October 2021 with, among other things, severe mixed bipolar I disorder with psychotic features and placed on a psychiatric plan, including medication.  In follow-up appointments at New Beginnings, Sparkman reported that he "[n]eeds to be on medication."

25.    Despite Sparkman signing another form on the day of his detainment – Authorization for Release of Medical Information – neither Nurse Tinder nor anyone else working at or for PCJ contacted Dr. Allen or New Beginnings, upon information and belief.

26.    Further, despite noting that Sparkman had last filled his 30-day prescriptions for Lexapro, Mirtazapine, and Wellbutrin on March 8, 2022—155 days earlier—Nurse Tinder took no action to help Sparkman obtain the medications he needed.  To the contrary, she checked "No" on the Assessment's fields for "Psychiatric Problems," "Psychiatrist," "Counselor," and "Suicide Ideas Now/In Past."

|  | Yes | No |
|---|---|---|
| Psychiatric Problems |  | ✓ |
| Hospitalizations |  | ✓ |
| Psychiatrist |  | ✓ |
| Counselor |  | ✓ |
| Suicidal Ideas Now |  | ✓ |
| In Past |  | ✓ |

27.    What is more, despite Sparkman's still unmet request to "meet with the counselor soon" of three days earlier, Nurse Tinder specifically rejected that request in checking "No" for the field, "Referral to counselor," explaining, "[i]nmate denies any acute medical problems at this time."

| Referral to counselor |  | ✓ |
|---|---|---|
| Referral to D&A |  | ✓ |
| Referral to dentist |  | ✓ |
| Referral elsewhere |  |  |

Summation *at this time. Inmate denies any acute medical problems*

28.    Upon information and belief, Sparkman was never seen by Counselor Dovensky.  Nor prior to his hanging was he ever seen by Dr. Hill.

**THE SUICIDE**

29.    The next day, August 11, 2022—without his medications and quarantined alone in Cell B-4—Sparkman was emotionally distraught.  According to an inmate in a neighboring cell, Sparkman was crying, throwing things,

11

demanding to speak to his family, begging for his medication, and shouting that he was *"f\*cking losing it."*

30.    In response, at approximately 6:06 pm, CO Zarawa checked on Sparkman and, according to the Coroner's report, *asked Sparkman if he was suicidal*, receiving a "no" response.  Apparently, CO Zarawa accepted Sparkman's self-serving, manipulative response and simply notified CO Rinehart that Sparkman "was upset but calmed down".

31.    *Neither CO Zarawa nor anyone else at PCJ sought any mental health or medical assistance whatsoever for Sparkman.*  Upon information and belief, Sparkman was not even observed at the 15-minute intervals at which he had been monitored on August 7–8, 2022.

32.    When CO Rosenwie went to the cell block twenty minutes later (6:26 pm), CO Rosenwie found Sparkman wearing his jumpsuit hanging from his bunk ladder by a second jumpsuit around his neck.  CO Rosenwie radioed for assistance and, with CO Zurawa, removed the jumpsuit from around Sparkman's neck and took him down from the ladder.  Sparkman was unresponsive, and so COs Zurawa and Rosenwie began CPR.  CO Rinehart called down to the medical room for Dr. Hill and Nurse Tinder, who were at PCJ tending to others.

33.    When Dr. Hill and Nurse Tinder arrived shortly thereafter, Sparkman was still breathless and blue, with fixed, dilated pupils and without a pulse.  Dr.

Hill took over CPR to no avail, after which CO Rosenwie deployed an Automatic External Defibrillator (AED) and was likewise unsuccessful.  The Potter County Coroner, Kevin Dusenbury, pronounced Sparkman dead at approximately 7:35 pm.[3]

## PREVALENCE OF INMATE SUICIDES

34.  Unfortunately, Sparkman's suicide was far from an isolated incident.

35.  According to a study by PennLive and the Pittsburgh Institute for Nonprofit Journalism, given its "low" inmate population of "about 33 people per day," PCJ had ***"the highest death rate"*** of all county jails in Pennsylvania in 2022.[4]

36.  Although statistics are unknown, Sparkman's death marks at least the fourth inmate death by suicide at PCJ since 2006.  Three of those suicides occurred between 2015 and 2022.  Upon information and belief, there were other suicides at PCJ known by the County but not yet confirmed by Plaintiff.

---

[3] Upon information and belief, PCJ video likely captured many of the aforementioned events.  Plaintiff's undersigned counsel requested all videos during formal pre-Complaint discovery, but PCJ's counsel objected to the production of same.

[4] Joshua Vaughn, "How Many Deaths Occurred in Your County's Jail?  See Our Database," *The Patriot News*, pennlive.com, Nov. 9, 2023 (emphasis added), *available at* https://www.pennlive.com/news/2023/11/how-many-deaths-occurred-in-your-countys-jail-see-our-database.html (last accessed July 24, 2024).

37.    On February 14, 2015, 25-year-old Donald Ray (DJ) Richardson, Jr. committed suicide at PCJ by hanging himself with a bedsheet in his cell.[5]

38.    After learning of Sparkman's death, Richardson's grandparents compared Richardson's suicide to Sparkman's, noting that Richardson "wasn't in the jail for long," and that "he used a sheet to hang himself from a bunk.  This gentleman [Sparkman] did the same scenario."  Like Sparkman, moreover, Richardson was diagnosed with bipolar disorder, among other mental illnesses, but was not on any medication at the time of his arrest.

39.    On September 7, 2020, 50-year-old Shane Lyon died by suicide at PCJ.[6]  According to PennLive, "officials did not report his death to the federal government or the Department of Corrections."[7]

---

[5] Donna LeSchander, "More Jail Families Voice Concerns, Inmate Speaks Out," *Potter Leader-Enterprise*, tiogapublishing.com, Sept. 11, 2022, *available at* https://www.tiogapublishing.com/potter_leader_enterprise/news/local/more-jail-families-voice-concernsinmate-speaks-out/article_cf5730ae-3210-11ed-8b5b-4760686963e6.html (last accessed July 24, 2024).

[6] Joshua Vaughn, "Most Deaths in Pa. Jails Went Unreported Despite Rules: 'It is Appalling,'" *The Patriot News*, pennlive.com, Feb. 9, 2022, *available at* https://www.pennlive.com/news/2022/02/most-deaths-in-pa-jails-went-unreported-despite-rules-it-is-appalling.html (last accessed July 24, 2024).

[7] *Id.*

40.    Likewise, 19-year-old Christopher Ruter—an all-star wrestler at Coudersport High School, family farmer, and member of the Coudersport Gospel Tabernacle—took his life at PCJ on or about March 18, 2006.[8]

41.    On the day of Sparkman's death, another inmate at the PCJ wrote a letter shared with the *Potter Leader-Enterprise* lamenting the mental-health conditions at the PCJ:

> I can't help but feel that this episode could have been avoided as well as past episodes of the same sorts[.]  The mental health of these individuals incarcerated here at the Potter County jail should be a higher priority that it seems it is.  As it stands now, there are no mental health services to help prevent or deal with situations like this when they arise.
>
> The protocol set to handle someone who is feeling suicidal is to parade him through the jail for all to see, strip him of all his clothing, as well as whatever dignity he may have left[.]  Then they put him in an observation cell dressed only in what is known as 'the turtle suit.' He might have to sit as long as overnight before he sees a counselor and I use that term very loosely.  All the while having to deal with the ridicule and shame on top of everything else.[9]

---

[8] Kimberley Hoak, "Teenage Inmate Commits Suicide," *Potter Leader Enterprise*, tiogapublishing.com, Mar. 22, 2006, *available at* https://www.tiogapublishing.com/potter_leader_enterprise/news/teenage-inmate-commits-suicide/article_f6077573-ace1-5143-ba46-ed3fcb85e7a3.html (last accessed July 24, 2024); "Christopher C. Ruter," *Potter Leader Enterprise*, tiogapublishing.com, Mar. 22, 2006, *available at* https://www.tiogapublishing.com/potter_leader_enterprise/christopher-c-ruter/article_b8bc722f-2612-59dd-8c54-5f15eb325f87.html (last accessed July 24, 2024).

[9] LeSchander, n.5, *supra*.

42.    Consistent with the above quoted inmate letter, Shena Martin, a mental health advocate for PCJ inmates, stated: "They don't get the help they need. They don't get to see a doctor and all they have is a counselor and she's not there all the time."[10]

43.    Nor are such expressions of concern limited to inmates of PCJ, as shown by meetings held by the PCJ Board of Inspectors.  On October 7, 2022, "[c]itizen Kim Goodenough addressed the board with her concerns about suicides at the jail."  At meetings such as this, members of the public voiced outraged over "this [suicide] happening *again and again*."[11]

44.    Notably, at the start of the October 7, 2022 meeting (the first jail board meeting following the Sparkman suicide), a member of the public questioned: "***How many more people need to commit suicide before it's considered murder?***"  At that same meeting, (a) the Board invited a guest to speak on the topic of medical cost containment; (b) representatives from the local ministerial association advised of their intent to establish a Potter County chapter

---

[10] LeSchander, n.5, *supra*.

[11] Donna LeSchander, "Potter County Saw Eventful 2022, Moves Forward with Safety and Recreation," *Potter Leader Enterprise*, tiogapublishing.com, Jan 2., 2023, *available at* https://www.tiogapublishing.com/potter_leader_enterprise/news/local/potter-county-saw-eventful-2022-moves-forward-with-safety-and-recreation/article_a34a8dbe-8abf-11ed-b8d2-6fd283ea17bd.html (last accessed July 26, 2024).

of the Pennsylvania Prison Society because the "recent suicide had to slap us in the face"; and (c) a Potter County Human Services administrator reported the need to prioritize mental health services and that more money was required to do so.

45.    Likewise, minutes of the Potter County Board of Commissioners' September 22, 2022 meeting reflect that one member of the community spoke up about the spike in deaths at PCJ "over the last several years":

> **PUBLIC COMMENTS ON AGENDA**
> Citizen questioned the commissioners as to why there have been 4-6 deaths in the jail over the last several years & will Warden Milford be finding out why when she goes to this training that is listed on the agenda.

Those minutes reflect that at the same meeting, citizen Lee Trayer "was crushed to hear about the suicide at the jail & has a lot to say however she will say just a few things. . . . Ms. Trayer questioned if Dawn Dovensky is still going into the jail[.]"

46.    "Commissioner Hayman responded," the minutes state, as follows:

[T]he Commissioners are just as saddened & appreciates the comments, questions, and concerns.  Yes, Dawn is still going into the jail; & *the board is trying to get other individuals in for mental health assessments and counseling and other services and it is very difficult.* (emphasis added)

Commissioner Grupp added:

[A]s you heard in this meeting; a tele mental contract was just approved and there is liability insurance that does cover a portion of these situations. . . .  As for the psychiatric issues, *everyone is struggling to find help.*  There is a mobile crisis center and officers are aware of this now and utilizing it.  Bradford & Olean are the only

17

two hospitals [that] can or will take the mental health patients and that
is only if beds are available. (emphasis added)

## PATTERN AND PRACTICE OF CONSTITUTIONALLY DEPRIVING PRISONERS WITH SERIOUS MENTAL ILLNESS

47.     Long before Defendants allowed Sparkman to end his life in their

custody, they were well aware of their failures to appropriately treat numerous

prisoners like Sparkman suffering from serious mental illness, including but not

limited to medical provider evaluations and the administration of necessary

medications.

48.     Indeed, at the inaugural meeting of the PCJ Board of Inspectors, on

August 6, 2021, the need for improved psychiatric services was discussed, as was a

proposed Telemental Health Services contract.  Upon information and belief, when

the County finally created a jail board the year before Sparkman's suicide, it was

one of the last counties in the Commonwealth to do so.

49.     At a September 3, 2021 meeting of the PCJ Board of Inspectors,

Judge Stephen P.B. Minor of the Potter County Court of Common Pleas "expressed

his support for enhancing services in the jail, which is an important consideration

in the sentencing process."  Members of the board "discussed the status of the

current programs and option in the areas of counseling, faith-based services,

employment, literacy, life skills and addiction/mental health treatment."  Counselor

Dovensky, meanwhile, "confirmed the need for psychiatric services at the jail."

50.    At the next meeting of the PCJ Board of Inspectors, on October 1, 2021, the Board reviewed a draft contract for telepsychiatry services at PCJ. According to minutes from that meeting, Counselor Dovensky "said about **30 percent** of inmates she sees could benefit from the telepsychiatry services." (Emphasis added.)

51.    Indeed, inmates' need for mental health treatment at PCJ was known at the highest levels of Potter County government.  At a meeting of the PCJ Board of Inspectors on November 5, 2021, minutes reflect that Warden Angela Milford reported Counselor Dovensky's comment "that a **very high proportion** of jail inmates have either mental health and/or addiction issues."  Warden Milford also reported on a draft telepsychiatry services contract, at which time "Board members raised concerns about some of the contract's elements related to start-up costs and the county's up-front financial obligation."

52.    At a December 3, 2021 meeting of the PCJ Board of Inspectors, Sheriff Glenn Drake, former warden of the PCJ, reported that he tried to bring mental-health services to PCJ before being derailed by the COVID-19 pandemic, services which Commissioner Hayman admitted were a "**dire need**."[12]

---

[12] Kelly Stemcosky, "Jail Will Offer Virtual Mental Health Services for Inmates," *Potter-Leader Enterprise*, tiogapublishing.com, Feb. 10, 2022, *available at* https://www.tiogapublishing.com/potter_leader_enterprise/news/local/jail-will-offer-virtual-mental-health-services-for-inmates/article_63fb64cd-c72c-58b5-a18f-0dd711ca3ce6.html (last accessed July 26, 2024).

53.    Nonetheless, the County continued to drag its feet over the course of the next year.  At the February 4, 2022 meeting of the PCJ Board of Inspectors, minutes reflect that Counselor Dovensky "asked for an update on the Telepsychiatry Services Contract.  She [w]as advised that the matter would be discussed later in the meeting."  Subsequently at that meeting, "Warden Milford advised that Telepsychiatry Services that will be provided through a contract ratified by the Jail Board at an earlier meeting have been slowed by questions over the provider's start-up fees.  Board members took no action, noting that contract still requires approval by the Potter County Board of Commissioners, during which time the start-up costs can be clarified."

54.    Reportedly, the hangup concerned a trivial $1500 discrepancy between a start-up fee of $2000 and $500 which was originally quoted.  Sheriff Drake said that the "mental health system is not getting any better" and that the discrepancy was "pennies in a bucket" when it comes to mental health, suicides, and lawsuits at the jail.[13]

55.    A month later, despite the "dire need" for mental-health treatment at PCJ, minutes of the March 4, 2022 meeting of the PCJ Board of Inspectors reflect

---

[13] Jessica Kenley, "PCoP and CCAP come together to agree to Potter County jail risk assessment", *Potter-Leader Enterprise*, tiogapublishing.com, February 10, 2022.

only that "[w]ork continues on implementing the tele-mental health program for
which the jail has contracted."

56.    At the August 5, 2022, board meeting—roughly a year after Counselor
Dovensky had confirmed the need for psychiatric care at the day and just six days
before Sparkman hung himself—the minutes reflect that County personnel were
still "reviewing contract details with a prospective provider" of telepsychiatry
services.  District Attorney Andy Watson reported:

> The law enforcement community is overburdened and frustrated by
> the lack of available services for individuals with mental health issues
> who come into contact with police.  By default, the jail is pressed into
> service as a last resort to ensure public safety.  DA Watson and Judge
> Minor both said multiple agencies must work together to improve
> crisis response services in Potter County and relieve the burden on
> law enforcement and the jail.

"Warden Milford," moreover, "noted that there is ***a need for services in the jail***,
but multiple delays have been encountered in efforts to reach final contract terms.
She said that a recommendation will be presented to the Board of Commissioners
for review and approval in the near future. (emphasis added)

57.    The widespread jail suicide and mental health problem, far beyond
just PCJ, has been well publicized for years now.  For example, in February of
2019, WHYY.org published an article titled "*81 Pa. county jail suicides in 4 years:
A look at how jails report deaths*".  In addition to the 81 reported suicides between
2015 and 2018 in Pennsylvania county jails, there were a staggering 715 suicide

attempts during the same 4 year period.  The article cited to a 2015 report from The Marshall Project titled "*Why Jails Have More Suicides than Prisons*", proffering that those confined in jails have a higher rate of mental illness and that a jail's intake protocols are not under the same microscope as in state prisons.

58.     In a February 20, 2020, Philadelphia Inquirer article titled *Pennsylvania prison suicides are at an all-time high. Families blame 'reprehensible' medical-health care,* Christine Tartaro, a professor of criminal justice at Stockton University, was quoted saying: "Suicide is very preventable in prison and jail systems . . . Increases in institutional suicides are often tied to insufficient psychiatric screening and inadequate mental-health staffing levels."

59.     On March 13, 2020, in an article reported by the Pennsylvania Prison Society titled *Little public scrutiny of 104 suicides behind walls of PA county jails*, it was noted: "Philadelphia, with the state's largest county jail system, reported the most suicides – 14 over five years.  But the issue isn't confined to the larger facilities, state data show – Potter County, with Pennsylvania's third-smallest county jail, had two suicides in the last five years."

60.     Moreover, in a recently settled lawsuit filed in this Court on September 1, 2020 against the County, CO Rosenwie, and others, denial of adequate medical care was alleged and underscored (*Yentzer v. Potter County*, M.D. Pa. 3:20-cv-01579).

61.     Despite numerous and repeated inmate suicides and suicide attempts over the years, the County failed to create, implement, and/or enforce the necessary policies and customs to protect civil rights of PCJ inmates, thereby establishing a custom of violating civil rights of those within their custody and control.

62.     Tragically, at what upon information and belief was the first meeting of the Potter County Board of Commissioners after Sparkman's death, on September 22, 2022, the Board finally and unanimously "approve[d]" the "Agreement for Telemental Health Services between CenClear and the Potter county Jail at a rate of $181.00 per hour; effective October 1, 2022 – September 30, 2023." Those services were never available to Sparkman. Indeed, in having his request to see Counselor Dovensky rejected, Sparkman was deprived of what few mental health services PCJ did potentially make available.

63.     Egregious and rampant failure on the part of the Officer Defendants and Medical Defendants led to Sparkman's tragic and preventable suicide.

64.     Plaintiff now seeks recovery from all Defendants for the catastrophic and fatal injuries, damages, and economic losses suffered by Sparkman, his father, and his son, as more fully described below.

## COUNT I – VIOLATION OF CIVIL RIGHTS (14th AMENDMENT) PLANTIFF v. DEFENDANTS

65.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

66. At all relevant times, Defendants, acting under color of law, were deliberately indifferent to Sparkman's serious medical needs in violation of the Eighth Amendment's ban on cruel and unusual punishment.

67. In particular, Defendants were deliberately and recklessly indifferent to Sparkman's vulnerability to suicide, which they each knew or should have known about on or about August 11, 2022.

68. For minutes, hours, and even days, Defendants possessed actual knowledge of Sparkman's serious mental illness—to the point that CO Zurawa pointedly asked Sparkman if he was suicidal—all of which amounted to telltale suicide risks.

69. Despite such knowledge, Defendants ignored, if not exacerbated, Sparkman's obvious suicidal propensities and failed to take necessary and available precautions that would have saved his life, such as housing him in the appropriate unit; providing the appropriate diagnoses and treatments, including medications, counseling, and trained medical health professionals including a Psychiatrist and/or Psychologist; ensuring that he was observed at all times or at least at regular intervals; accurately documenting such observations; denying him a means to commit suicide (*i.e.*, not placing him alone in a cell with a bunk and a spare jumpsuit that could be fashioned into a noose); and rendering aid immediately and emergently once Sparkman started hanging.

24

70.    At a minimum, Defendants were duty bound to follow well established suicide prevention standards and guidelines, the purpose of which is to protect and enhance the mental health of inmates such as Sparkman.

71.    The 2014 Standards for Health Services in Jails and 2015 Standards for Mental Health Services for Correctional Facilities, promulgated by the National Commission on Correctional Health Care, contain a **SUICIDE PREVENTION PROGRAM** (Section J-G-05 and Section MH-G-04, respectively).  The Program established, *inter alia*:

- *Nonacutely suicidal* inmates should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes (*e.g.*, 5, 10, 7 minutes), with unpredictable, documented supervision maintained;

- Patients are reassessed regularly to identify any change in condition indicating a need for a change in supervision level or required transfer or commitment.  The evaluation includes procedures for periodic follow-up assessment after the individual's discharge from suicide precautions;

- Treatment strategies and services to address the underlying reasons (e.g. depression) for the inmate's suicidal ideation are to be considered, including treatment when the inmate is at heightened risk as well as follow-up interventions and monitoring to reduce the likelihood of relapse;

- Procedures for communication between mental health, health care, and correctional personnel regarding inmate status are in place to provide clear and current information; and

- Housing.  Unless constant supervision is maintained, a suicidal inmate is not isolated but is housed in the general population, mental health unit, or medical infirmary, and located in close proximity to staff.  All cells or rooms housing suicidal inmates are as suicide-resistant as possible (e.g., without

protrusions of any kind that would enable hanging).

72.     Defendants' failure to treat, monitor, and address Sparkman's legitimate and serious medical needs transcended contemporary standards of decency, are shocking to the conscience of mankind, and violated his Fourteenth Amendment right to be free from cruel and unusual punishment.

73.     Defendants' unreasonable, egregious, malicious, willful, and intentional acts and omissions constitute a deliberate indifference and callous disregard for Sparkman's life, safety, and well-being.

74.     As a direct and proximate result of Defendants' unlawful and unconstitutional behavior, Sparkman suffered serious bodily harm and death, and Sparkman, along with his father and son, suffered other catastrophic damages as set forth below.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## COUNT II – VIOLATION OF CIVIL RIGHTS (*MONELL* CLAIMS) PLAINTIFF v. THE COUNTY

75.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

76.    The violations of Sparkman's constitutional rights as set forth above were directly and proximately caused by the deliberate indifference of the County to the need for hiring, training, supervision, investigation, monitoring, and/or discipline with respect to the provision of specialized medical care to inmates such as Sparkman, under their custody and control.

77.    The violations of Sparkman's constitutional rights as forth above were directly and proximately caused by the encouragement, tolerance, ratification of, and deliberate indifference of the County to the policies and practices of its agents and employees of refusing, delaying, interfering with, or negligently providing timely and appropriate care and treatment to those in special need like Sparkman.[14]

78.    The violations of Sparkman's constitutional rights as set forth above were directly and proximately caused by the abject failure of the County, with deliberate indifference, to develop, implement, update, and/or enforce policies and practices to ensure that inmates like Sparkman received timely, necessary, and appropriate medical care for serious mental illness and critical life saving measures.

79.    On and well before August 11, 2022, the County knew or certainly should have known of the need to improve and correct failed hiring, training,

[14] Consistent with this longstanding pattern and practice, upon information and belief none of the Officer Defendants or Medical Defendants were disciplined as it pertains to Sparkman.  To the contrary, Counselor Dovensky was given a raise.

supervision, investigation, monitoring, discipline, policies, and practices by virtue

of, *inter alia,* a laundry list of other suicides and suspected suicide attempts,

lawsuits, published statistics, news articles, and discussions of the PCJ Board of

Inspectors and the Potter County Board of Commissioners regarding inmates'

mental health, generally, and suicides, specifically, as alleged above.

80.    With the pandemic well underway and PCJ well below capacity, upon

information and belief, the County should have ensured proper staffing,

recognizing that forced isolation of someone like Sparkman would heighten his

vulnerability and require constant vigilance and attention.

81.    The above referenced failures proximately caused Sparkman's serious

bodily injuries and death in that they directly and in natural and continuous

sequence produced, contributed substantially, or enhanced such injuries and death.

82.    The aforementioned acts and/or omissions constitute willful and

wanton misconduct in disregard of the rights, health, well-being, and safety of

Sparkman, to his detriment and that of his family.

**WHEREFORE,** Plaintiff demands judgment in his favor and against

Defendants, jointly and severally, for wrongful death and survival damages,

compensatory and punitive damages in an amount in excess of One-Hundred and

Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such

other relief as the Court deems just and proper.

## COUNT III – MEDICAL NEGLIGENCE (STATE LAW)
## PLAINTIFF v. MEDICAL DEFENDANTS

83.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

84.    At all relevant times, the Medical Defendants were, upon information and belief, licensed to practice medicine in the Commonwealth of Pennsylvania, and had a duty to comply with generally accepted medical and mental health standards of care in their medical treatment of Sparkman.

85.    The Medical Defendants violated their duty of care to Sparkman and were careless, negligent, and reckless in the following respects:

  a.  Failure to timely and accurately recognize, diagnose, and treat Sparkman's medical condition, including serious mental illness;

  b.  Failure to timely and accurately diagnose Sparkman's behavior as suicidal and not just self-serving;

  c.  Failure to perform an intake physical upon Sparkman's detainment or promptly thereafter;

  d.  Failure to perform a structured suicide risk assessment and reassessment on a timely and accurate basis;

  e.  Failure to implement and maintain an intense and appropriate treatment plan to minimize the risk of suicide;

  f.  Failure to render proper and timely treatment and care to Sparkman, including on an emergency/stat basis as required under the circumstances;

  g.  Failure to obtain timely and appropriate consultation from specialists, including psychiatrists and psychologists;

h.  Failure to ensure that the mental health referral to Counselor Dovensky was not cancelled or postponed;

i.  Failure to timely and appropriately prescribe and administer necessary medications;

j.  Failure to provide necessary medical information to Sparkman about the care he required and providing incomplete and incorrect information to him regarding his care;

k.  Failure to provide necessary, complete, and correct medical information to other medical professionals caring for Sparkman about the care he required and/or was provided;

l.  Failure to timely appreciate Sparkman's changes in mental status and stressors he was under;

m. Failure to house Sparkman in the appropriate housing unit and for the appropriate amount of time;

n.  Failure to ensure that Sparkman was observed at documented, regular intervals while in quarantine;

o.  Failure to ensure that Sparkman was not provided with the means to hang himself – a spare jumpsuit and bunk while in a cell alone;

p.  Failure to prevent Sparkman from creating a noose from his jumpsuit;

q.  Failure to ensure that others, including supervisors, were timely and appropriately notified when Sparkman had access to the means of suicide;

r.  Failure to timely obtain and review Sparkman's counseling and medical records from New Beginnings;

s. Failure to perform and require accurate recordkeeping, including but not limited to Sparkman's Nursing Assessment Form;

t. Failure to heed and appropriately respond to Sparkman's cries for help in the hours before his hanging;

u. Failure to timely and appropriately communicate with and train the Officer Defendants regarding Sparkman's serious medical needs and vulnerability to suicide;

v. Failure to follow appropriate suicide related training and policies;

w. Failure to perform their obligations in accordance with their Agreements with the County, under which Sparkman was an intended beneficiary; and

x. Entrusting Sparkman's care to individuals who they should have known would perform their duties in a negligent and/or reckless manner.

86. The Medical Defendants' violation of their duty of care, in reckless and wanton disregard for Sparkman's safety and well-being, increased the risk of harm to Sparkman and was a direct and proximate cause and substantial factor in bringing about Sparkman's serious bodily injuries and death.

87. To the extent that Dr. Hill was acting as employee, agent and/or ostensible agent of UPMC Cole, acting within the scope and course of his employment, agency, and/or ostensible agency, UPMC Cole is vicariously liable to Plaintiff.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for wrongful death and survival damages,

31

compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## COUNT IV – WRONGFUL DEATH (STATE LAW)
## PLAINTIFF v. DEFENDANTS

88.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

89.    Plaintiff is the legal representative of the Estate of Paul E. Sparkman, Jr.

90.    Plaintiff brings this action by virtue of 42 Pa. C.S.A. §8301 and Pennsylvania Rule of Civil Procedure 2202 and claims all benefits of the Wrongful Death Act on behalf of himself and all other persons entitled to recover under the law, including Sparkman's son.

91.    By reason of Sparkman's tragic death, his Administrator and/or his beneficiaries have suffered pecuniary losses and seek recovery of all medical, funeral, and administration expenses incurred as well as lost support, comfort, society, companionship, guidance, solace, protection and other services Sparkman would have provided during his lifetime.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and

32

Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## COUNT V – SURVIVAL ACTION (STATE LAW)
## PLAINTIFF v. DEFENDANTS

92.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

93.     Plaintiff brings this action on behalf of the Estate of Paul E. Sparkman, Jr. by virtue of 42 Pa. C.S.A §8302 and claims all benefits of the Survival Act on behalf of himself and all other persons entitled to recover under the law, including Sparkman's son.

94.     Plaintiff claims on behalf of Sparkman all damages suffered, including, but not limited to, significant conscious pain and suffering, catastrophic and fatal physical injuries and mental anguish, great fright, scarring, disfigurement, embarrassment, humiliation, loss of ability to enjoy life's pleasures, as well as the loss of future earning capacity from August 11, 2022, onwards.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

33

## DEMAND FOR JURY TRIAL

In accordance with the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all counts and issues raised herein.

**EISENBERG, ROTHWEILER,
WINKLER, EISENBERG & JECK, PC**

By:     /s/ Stephan A. Cornell
        STEPHAN A. CORNELL, ESQ.
        1634 Spruce Street
        Philadelphia, PA 19103
        (215) 546-6636
        (215) 546-3641 fax
        *Attorney for Plaintiff*

Dated: August 8, 2024