# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL E. SPARKMAN, SR.,
*individually and as administrator of*
THE ESTATE OF PAUL E.
SPARKMAN, JR.,

              Plaintiff,

       v.

POTTER COUNTY, *et al.*,

             Defendants.

No. 4:24-CV-1338

(Chief Judge Brann)

## MEMORANDUM OPINION

### JANUARY 21, 2025

## I.    BACKGROUND

On August 8, 2024, Plaintiff Paul E. Sparkman, Sr. filed a five-count complaint against a number of Defendants related to the Potter County, Pennsylvania Jail (the "Jail"). As relevant to the currently pending motions, the Defendants include Social Worker/Counselor Dawn Dovensky ("Counselor Dovensky") (a Jail employee) and the University of Pittsburgh Medical Center Charles Cole Memorial Hospital ("UPMC Cole") (the Jail's contractual healthcare provider).

The claims in this case arise from the death of Plaintiff's son, Paul E. Sparkman, Jr. ("Sparkman"), by suicide while incarcerated at the Jail. In essence, Plaintiff alleges that Jail personnel failed to provide necessary medical care to his son and thereby caused his suicide. He further alleges that deficiencies in such care

at the Jail were well known to Jail staff, administrators, and Potter County officials, yet went unaddressed for an unreasonable length of time.

Counselor Dovensky and UPMC Cole filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The motions are now ripe for disposition; for the reasons that follow, UPMC Cole's motion is granted, and Counselor Dovensky's motion is denied. Plaintiff will be provided leave to amend the complaint.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[1] and *Ashcroft v. Iqbal*,[2] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[3] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that,

---

[1]    550 U.S. 544 (2007).
[2]    556 U.S. 662 (2009).
[3]    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[4]

When deciding a motion to dismiss, a court generally considers only the allegations in the complaint, exhibits attached thereto, and facts of public record.[5] Normally, to go consider anything beyond those sources, a motion to dismiss must be converted to a motion for summary judgment.[6] But consideration of materials outside the complaint is not completely barred on a 12(b)(6) motion. Courts may consider any documents that are integral or explicitly relied upon in the complaint.[7] "However, before materials outside the record may become the basis for a dismissal, several conditions must be met."[8] "For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."[9] It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document.[10] In this matter, this Court finds that these conditions have been met, and will consequently consider Plaintiff's attachments.

---

[4]   *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[5]   *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

[6]   *See* Fed. R. Civ. P. 12(d).

[7]   *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[8]   *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[9]   *Id.*; *see also Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

[10]  *Faulkner*, 463 F.3d at 134.

## B.    Facts Alleged in the Complaint

The facts alleged in the complaint, which this Court must accept as true for the purposes of this motion, are as follows.

On August 7, 2022, Sparkman was incarcerated at the Potter County Jail.[11] Although not addressed by the parties, it appears he may have awaiting extradition to Schuylkill County for criminal proceedings.[12] Sparkman completed several intake forms when he arrived at the Jail, including an "Application for Defender Services," a "Pre-Acceptance Qualification Form," an "Inmate Classification Form," a "Receiving Screening Form," and a "Brief Jail Mental Health Screen."[13] On these forms, Sparkman disclosed a host of mental health difficulties. He specifically listed that he suffered from "post-traumatic stress disorder (PTSD), separation anxiety, ADD [(attention deficit disorder)], ADHD [(attention deficit hyperactivity disorder)], bipolar [disorder], intermittent explosive disorder (IED), and depression."[14] Sparkman also stated that he was prescribed the antidepressants Wellbutrin (bupropion) and Remeron (mirtazapine), and the alpha-blocker Minipress (prazosin).[15] On one form, Sparkman specifically indicated that, although

---

[11]  Doc. 1 (Compl.) ¶ 18.
[12]  *See Commonwealth v. Sparkman*, No. CP-54-MD-0000794-2022 (Pa. Ct. C.P. Schuylkill Cnty. 2022) (noting an "Arrest Prior to Requisition" pursuant to 42 Pa. Cons. Stat. § 9161 and a processing status of "Awaiting Extradition Hearing" as of August 8, 2022).
[13]  Doc. 1 ¶¶ 18-21.
[14]  *Id.* ¶¶ 18, 20
[15]  *Id.* ¶ 18, 20-21.

it "should be continuously administered or available," he did not have any Wellbutrin.[16]

Sparkman further explained that he had received mental health treatment in the past and that he wished to continue treatment at the Jail. He indicated that he "had . . . prior Ps[y]chiatric/Psy[c]hological Counseling," and was "presently under the care of a doctor" although he was "in [the] process of changing" providers.[17] On the Inmate Classification Form, Sparkman specifically requested to "meet with the counselor soon."[18] That form was reviewed and co-signed by a Defendant Corrections Officer ("CO"), who indicated on the Brief Jail Mental Health Screen that he had "referred Sparkman to 'Dawn D,'" a person who, barring an unbelievable coincidence, is certain to be Counselor Dovensky.[19] It does not appear that Counselor Dovensky met Sparkman while he was alive.[20]

Despite Sparkman's litany of disorders and his clearly indicated need of medication, he was not seen by any medical professional until three days after arriving at the Jail.[21] On August 10, 2022, Registered Nurse Valerie Tinder ("Nurse Tinder"), a Jail employee and Defendant, conducted a "Nursing Assessment" of Sparkman as part of the intake process.[22] It appears that Sparkman communicated

---

[16]  *Id.* ¶ 19.
[17]  *Id.* ¶ 18, 20.
[18]  *Id.* ¶ 20.
[19]  *Id.* ¶ 21.
[20]  *Id.* ¶ 22.
[21]  *Id.* ¶ 22, 23.
[22]  *Id.* ¶¶ 11, 23.

his mental health issues to Nurse Tinder. He explained that he was under the care of "Dr. Nancy Allen" at a treatment facility called "New Beginnings," and provided contact information for both his Doctor and her practice.[23] Sparkman also informed Nurse Tinder that he had last filled his prescriptions for "Lexapro, Mirtazapine, and Wellbutrin on March 8, 2022—155 days earlier."[24] At the end of the Nursing Assessment, Nurse Tinder inexplicably checked "No" in the fields for "Psychiatric Problems," "Hospitalizations," "Psychiatrist," "Counselor," and "Suicidal Ideas Now" and "In Past," declined to refer Sparkman to a counselor, and wrote that "[i]nmate denies any acute medical problems at this time."[25]

UPMC Cole contracts with the Jail to provide certain medical care to inmates.[26] The contract requires UPMC Cole to provide an on-site physician (or Physician's Assistant/Certified Nurse Practitioner) at the Jail at least once a week.[27] The physician's duties include "evaluat[ing] ill inmates," "perform[ing] physicals on newly committed inmates, trustees for kitchen duty and kitchen employees," and ordering necessary medications, among others.[28] The physician detailed to the Jail

---

[23] *Id.* ¶ 23.

[24] *Id.* ¶ 26.

[25] *Id.* ¶¶ 26-27. The Court notes that Nurse Tinder's Assessment is inexplicable in the literal sense—on the present record it is impossible to know whether Sparkman misrepresented his own history and present state, or Nurse Tinder falsely recorded them.

[26] *Id.* ¶ 9; Doc. 35-2 ("Agreement for Physician Servs.").

[27] Doc. 35-2 ¶ 1(a).

[28] *Id.* ¶¶ 1(c)-(e).

during the relevant period was Doctor Aaron Hill ("Dr. Hill"), who is a Defendant in this case.[29] It does not appear that Dr. Hill met Sparkman while he was alive.[30]

On August 11, 2022, Sparkman was isolated in a quarantine cell.[31] He became emotionally distraught and, according to a neighboring inmate, was "crying, throwing things, demanding to speak to his family, and shouting that he was 'fucking losing it.'"[32] At approximately 6:06 p.m., a Defendant CO checked on Sparkman and asked if he was suicidal.[33] Sparkman said he wasn't, so the CO took no action and told another Defendant CO that Sparkman "was upset but calmed down."[34]

Twenty minutes later, at 6:26 p.m., a Defendant CO checked on Sparkman and found him hanging from his bunk ladder with a spare jumpsuit tied around his neck.[35] The CO radioed for help, untied Sparkman and took him down, and, finding him unresponsive, began CPR.[36] Dr. Hill and Nurse Tinder responded to the help call, and Dr. Hill took over CPR.[37] When CPR didn't work, a Defendant CO deployed an Automatic External Defibrillator, which likewise failed to revive Sparkman.[38] Sparkman was pronounced dead at approximately 7:35 p.m.[39]

---

[29]   Doc. 1 ¶ 10.
[30]   *Id.* ¶ 22.
[31]   *Id.* ¶ 29.
[32]   *Id.*
[33]   *Id.* ¶ 30.
[34]   *Id.* ¶¶ 30-31.
[35]   *Id.* ¶ 32.
[36]   *Id.*
[37]   *Id.* ¶ 33.
[38]   *Id.* ¶ 33.
[39]   *Id.*

Sparkman's suicide was not an isolated incident at the Jail.[40] A PennLive and Pittsburgh Institute for Nonprofit Journalism study showed that the Jail had "the highest death rate" as a proportion of population "of all county jails in Pennsylvania in 2022."[41] Since 2006, at least four inmates at the Jail have committed suicide, and three of those occurred between 2015 and 2022.[42] Following Sparkman's suicide, an inmate at the Jail wrote a letter shared with the media describing the poor mental health services available, stating that "there are no mental health services to help prevent or deal with situations like this when they arise."[43] Plaintiff also details Potter County officials' acknowledgement of the problem of frequent suicides at the Jail in his complaint.[44]

Plaintiff initiated the instant suit to recover for his son's death on August 8, 2024. As relevant to the moving Defendants, he brings claims for a violation of the Eighth Amendment's ban on cruel and unusual punishment and state law medical

---

[40]  *Id.* ¶ 34.

[41]  *Id.* ¶ 35 (citing Joshua Vaughn, *How Many Deaths Occurred in Your County's Jail? See Our Database*, PENNLIVE (Nov. 9, 2023), https://www.pennlive.com/news/2023/11/how-many-deaths-occurred-in-your-countys-jail-see-our-database.html). It is worth noting that this statistic is almost entirely attributable to the Jail's low inmate population of "about 33 people per day." *See id.* Sparkman was the only person to die at the Jail in 2022. Vaughn, *supra*.

[42]  Doc. 1 ¶ 36. Plaintiff notes that more suicides may have occurred but were not reported.

[43]  *Id.* ¶ 41 (citing Donna LeSchander, *More Jail Families Voice Concerns, Inmate Speaks Out*, POTTER LEADER-ENTERPRISE, (Sept. 11, 2022), https://www.tiogapublishing.com/potter_leader_enterprise/news/local/more-jail-families-voice-concernsinmate-speaks-out/article_cf5730ae-3210-11ed-8b5b-4760686963e6.html).

[44]  *Id.* ¶¶ 43-56.

negligence.[45] He asserts his right to bring these claims under Pennsylvania's Wrongful Death and Survivorship Acts.[46]

## C.    Analysis

Counselor Dovensky argues that the claims against her should be dismissed because she did not know or have any obligation to know that Sparkman required

---

[45]  The basis for Plaintiff's constitutional claim is not entirely clear. The relevant count is titled "Violation of Civil Rights (14th Amendment)," and Plaintiff specifically alleges in that count that "Defendants . . . were deliberately indifferent to Sparkman's serious medical needs in violation of the Eighth Amendment's ban on cruel and unusual punishment." Doc. 1 ¶ 66. This is a fairly standard way of pleading an Eighth Amendment claim against state officials—after all, the Eighth Amendment is applicable to the states through the Fourteenth Amendment. *See Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008). However, in his briefing, Plaintiff appears to suggest that his invocation of the Eighth Amendment was a reference to the Third Circuit's application of Eighth Amendment principles in the context of a specific type of claim brought directly under the Fourteenth Amendment. Doc. 36 at 12.

Which type of claim Plaintiff can bring—cruel and unusual punishment (Eighth Amendment through Fourteenth Amendment) or substantive due process (Fourteenth Amendment alone)— depends on whether Sparkman was incarcerated as a convicted inmate or a pretrial detainee. *See Hay v. George Hill Corr. Facility*, 349 F. Supp. 3d 463, 467 (E.D. Pa. 2018) (citing *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005)); *McAndrew v. Northumberland Cnty.*, No. 22-CV-0834, 2023 WL 5351994, at *3 n.31 (M.D. Pa. Aug. 21, 2023). But, as noted, the complaint contains no explanation for his incarceration. Ultimately, this is a distinction without a difference for the purposes of the instant motions because the Eighth and Fourteenth Amendment inquiries converge in the prison suicide context. *Palakovic v. Wetzel*, 854 F.3d 209, 223 (3d Cir. 2017).

Nevertheless, doctrinal clarity is generally important and, to the extent the Eighth and Fourteenth Amendment standards might diverge, Plaintiff's claims must be properly framed to ensure the correct rules apply. For this motion, the Court follows the path suggested by Plaintiff's complaint and treats the constitutional count as asserting a claim for a violation of the Eighth Amendment. If Plaintiff submits an amended complaint, he should take the opportunity to resolve this confusion.

[46]  *See* 42 Pa. Cons. Stat. §§ 8301, 8302.
  The parties agree, as does the Court, that Plaintiff's independent Wrongful Death and Survivorship claims rise and fall with the underlying tort claims. *See Simmons v. Simpson House, Inc.*, 259 F. Supp. 3d 200, 209 (E.D. Pa. 2017). Accordingly, these counts will be dismissed or permitted to continue based on the outcome of Plaintiff's tort claims.

counseling.[47] UPMC Cole argues that the claims against it should be dismissed because (1) it is not a "person" amenable to suit under 42 U.S.C. § 1983, and (2) its agent Dr. Hill was not negligent in providing care to Sparkman because he did not know or have any obligation to know that Sparkman required care.[48]

Plaintiff concedes that UPMC Cole is not amenable to a cause of action under 42 U.S.C. § 1983 and agrees to dismissal of that claim.[49] He opposes any other dismissal and contends that Dr. Hill was contractually obligated to provide care to Sparkman,[50] and that Counselor Dovensky was aware of Sparkman's mental health issues and his desire to see her yet failed to take any action.[51]

The Court begins by analyzing Counselor Dovensky's conduct under the more demanding standard of recovery for a violation of the Eighth Amendment before turning to the question of whether she or Dr. Hill was negligent.

### 1.    Section 1983

Title 42 U.S.C. § 1983 provides a procedural vehicle for private plaintiffs to enforce the Constitution when they suffer violations under color of state law.[52] So to plead a Section 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

---

[47]    Doc. 30 (Counselor Dovensky Mot. to Dismiss Brief).
[48]    Doc. 23 (UPMC Cole Mot. to Dismiss Brief).
[49]    Doc. 35 (UPMC Cole Opp'n) at 10 (citing *Kohr v. Rivello*, No. 4:24-CV-1336, 2024 WL 4445974, at *3 (M.D. Pa. Oct. 8, 2024)).
[50]    *Id.* at 10-16.
[51]    Doc. 36 (Counselor Dovensky Opp'n).
[52]    *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).

deprivation was committed by a person acting under color of state law."[53] There is no dispute that Counselor Dovensky, as an employee of the Jail, was acting under color of state law at all relevant times. Plaintiff contends that Sparkman's Eighth Amendment right to be free from cruel and unusual punishment was violated when he was provided such deficient medical care that he committed suicide.[54]

The Eighth Amendment to the United States Constitution prohibits infliction of "cruel and unusual punishments."[55] "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."[56] "A particular vulnerability to suicide represents a serious medical need."[57] The Third Circuit has established a framework for analyzing Eighth Amendment deliberate indifference to medical needs claims in the context of prison suicides. To make out an Eighth Amendment claim, "a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability."[58]

---

[53]   *West v. Atkins*, 487 U.S. 42, 48 (1988).

[54]   Doc. 1 ¶¶ 65-74.

[55]   U.S. Const. amend. VIII.

[56]   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, & Stevens, JJ.))

[57]   *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) ("*Colburn II*")).

[58]   *Colburn II*, 946 F.2d at 1023 (citing *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988) ("*Colburn I*")).

11

### a.    Particular Vulnerability

"The requirement of a 'particular vulnerability to suicide' speaks to the degree of risk inherent in the detainee's condition."[59] "That degree of risk must be a 'strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'"[60]

Counselor Dovensky concedes that "Sparkman's medical needs were objectively serious, that is he was incarcerated under conditions that posed him substantial risk of harm."[61] Accepting this concession, the Court finds that Plaintiff's allegations are sufficient to survive a motion to dismiss on the first *Colburn* element.[62] Plaintiff alleges that Sparkman suffered from PTSD, separation anxiety, ADD, ADHD, bipolar disorder, IED, and depression,[63] and was prescribed several

---

Although the *Colburn* test was developed in the context of pre-trial detainees' substantive due process rights, it has since been applied in analyzing the Eighth Amendment claims of convicted prisoners who committed suicide. *Palakovic*, 854 F.3d at 223-24.

[59]    *Colburn II*, 946 F.2d at 1024.

[60]    *Palakovic*, 854 F.3d at 222 (quoting *Colburn II*, 946 F.2d at 1024).

[61]    Doc. 30 at 8.

[62]    Without Counselor Dovensky's concession, whether the first *Colburn* element is met may be a closer question. *See, e.g.*, *Estate of Thomas v. Fayette Cnty.*, 194 F. Supp. 3d 358, 376-77 (W.D. Pa. 2016) ("[O]ther cases in our Circuit have held that even evidence of actual suicide correlates . . . does not establish a particular vulnerability for suicide." (collecting cases)); *McAndrew*, 2023 WL 5351994, at *4 (noting the importance of the plaintiff's allegation that the decedent inmate was placed on suicide watch). On the Court's review, precedent generally requires a plaintiff to include facts that the inmate had recently stated his desire to commit suicide or had actually attempted to do so (and that this information was known to the defendants). *See, e.g.*, *Bingham v. Lancaster Cnty.*, 709 F. Supp. 3d 176, 185-86 (E.D. Pa. 2024) (plaintiff was particularly vulnerable to suicide when he "had attempted suicide twice before his July 17 death and had exhibited suicidal ideation on at least three separate occasions . . . [and] [h]is two most recent instances of suicidal ideation occurred in the days before his death"). With Counselor Dovensky's concession in mind, however, the Court finds that it is appropriate to allow Plaintiff's claim against her to proceed to discovery on this element.

[63]    Doc. 1 ¶¶ 18, 20

antidepressants which he had likely not taken for several months.[64] He noted that he was actively receiving treatment, and requested to speak to a counselor at the prison.[65] Pairing these disorders with the obvious environmental stresses that accompany imprisonment, Plaintiff has adequately alleged that Sparkman was "particularly vulnerable" to inflicting harm upon himself. Moreover, on the day of his death, Sparkman's conditions coalesced into an apparent mental collapse during which he screamed, threw things, and "begg[ed] for his medication."[66] At that point there could simply be no reasonable doubt that the risk of self-harm was extreme and immediate.[67] Accordingly, Plaintiff has adequately pled the first *Colburn* element.

### b.    Knew or Should Have Known

A defendant may be liable in a prison suicide case if she "knew or should have known of the individual's particular vulnerability" to suicide.[68] The likelihood of suicide generally "must be so obvious that a lay person would easily recognize the necessity for preventative action,"[69] but here, where Counselor Dovensky had some specialized mental health training,[70] the probability of suicide need only be apparent

---

[64]   *Id.* ¶¶ 18, 20-21, 26.

[65]   *Id.* ¶¶ 18, 20.

[66]   *Id.* ¶ 29.

[67]   There is no evidence that Counselor Dovensky was aware of Sparkman's state immediately before he committed suicide, but, because some non-moving Defendants witnessed this event, the Court believes that this point is worth making now.

[68]   *Palakovic*, 854 F.3d at 223-24.

[69]   *Colburn II*, 946 F.2d at 1025 (internal quotation omitted).

[70]   *See* Doc. 1 ¶ 12.

to a person with similar education.[71] Counselor Dovensky argues that the complaint is deficient in this regard. She contends that, "[o]n its face, Plaintiff's Complaint does not include a single fact that indicates that [Counselor Dovensky] had knowledge of any risks to Sparkman's health and/or safety."[72] That is incorrect.

Plaintiff alleges that, on August 7, 2022—four days before Sparkman's death—"[i]n step with Sparkman's request . . . to 'meet with the counselor soon,' CO Rosenwie referred Sparkman to 'Dawn D.'"[73] Taking this allegation as true and drawing reasonable inferences in Sparkman's favor,[74] it adequately establishes that Counselor Dovensky knew about Sparkman's suite of disorders, which she concedes meets the "particular vulnerability to suicide" standard. If CO Rosenwie did in fact refer Sparkman to Counselor Dovensky, it is reasonable to assume that he communicated Sparkman's conditions to her either by mouth or by including the intake forms with the referral. And, if CO Rosenwie merely included the forms, it is also reasonable to infer that Counselor Dovensky read them sometime in the four days before Sparkman died.[75] That is sufficient to satisfy the second *Colburn* element.

---

[71]  *Estate of Kempf v. Wash. Cnty.*, No. 15-CV-1125, 2018 WL 4354547, at *15 (W.D. Pa. Sept. 12, 2018) (citing *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003)).

[72]  Doc. 30 at 9.

[73]  Doc. 1 ¶ 21.

[74]  *Iqbal*, 556 U.S. at 678; *Phillips*, 515 F.3d at 228, 231.

[75]  August 8, 2022, (the day after Sparkman's intake) was a Monday, so Counselor Dovensky may have had as many as four full business days to review the forms before Sparkman committed suicide after 6:00 p.m. on Thursday, August 11, 2022.

### c.    Reckless Indifference

Although the Third Circuit has not clearly delimited the third factor, *Colburn* teaches that "reckless indifference" entails at least "something beyond mere negligence."[76] In holding that this inquiry requires an analysis of each case "on its aown facts," the Third Circuit explained that three previously-litigated fact patterns "provide helpful guidance in determining whether a case meets the . . . standard."[77] Specifically, a defendant may be recklessly indifferent if she: (1) "took affirmative action directly leading to the suicide"; (2) "actually knew of the suicidal tendencies of a particular prisoner and ignored the responsibility to take reasonable precautions"; or (3) "failed to take 'necessary and available precautions to protect the prisoner from self-inflicted wounds.'"[78] Assuming that Counselor Dovensky knew about Sparkman and his mental health diagnoses, her failure to speak with him within four days of his intake is sufficiently culpable conduct to state a claim.

Two specific pieces of information convince the Court that Counselor Dovensky had a responsibility to take timely action to avoid Sparkman's suicide. First, and most obviously, Sparkman requested to meet with a counselor "soon."[79] Given the host of mental health issues he had described upon intake, Sparkman's

---

[76]  *Palakovic*, 854 F.3d at 222, 224 & n.15 (using the terms "reckless indifference" and "deliberate indifference" interchangeably and stating that it was "not . . . necessary to parse these phrases to determine whether there is some distinction between them" (citing *Colburn II*, 946 F.2d at 1024-25)).

[77]  *Id.* at 231.

[78]  *Id.* (citing *Freedman v. City of Allentown*, 853 F.2d 1111, 1115-16 (3d Cir. 1988)).

[79]  Doc. 1 ¶ 20.

request should have triggered a prompt response. Moreover, Sparkman also disclosed that he was without his Wellbutrin prescription, which "should be continuously administered or available."[80] Combining these assertions, Plaintiff has plausibly alleged that Counselor Dovensky was aware that an unstable and unmedicated new inmate had requested to see her, yet she took no action at all for at least four days. This failure is especially egregious given the Jail's low inmate population and known deficiencies in providing mental health services.[81] Accordingly, Plaintiff has satisfied the third *Colburn* factor.

Plaintiff's allegations are sufficient to state a claim against Counselor Dovensky for violating Sparkman's Eighth Amendment rights. Her motion to dismiss the complaint against her as to that count is therefore denied.

### 2.    Medical Negligence

Plaintiff brings medical negligence claims against Counselor Dovensky directly and against UPMC Cole based on Dr. Hill's conduct under the doctrine of vicarious liability. It is well established that a constitutional claim to recover for a failure to prevent a prison suicide entails "a level of culpability higher than a

---

[80]    *Id.* ¶ 19.
[81]    *Id.* ¶¶ 35, 49-56 (describing the Jail's low population and documented problems with providing mental health services, including Counselor Dovensky's acknowledgment of the issue); *see Palakovic*, 854 F.3d at 231 (reasoning that the plaintiff's allegation that the prison's history of inadequate mental health care and inmate suicides was common knowledge contributed to and was "perhaps [the] most important[]" consideration in finding that the third *Colburn* factor was satisfied).

negligent failure to protect from self-inflicted harm."[82] As a corollary, allegations sufficient to state a constitutional claim will also meet the lower standard necessary to state a claim for negligence. Therefore, based on the preceding analysis, Plaintiff has stated a medical negligence claim against Counselor Dovensky, and her motion to dismiss that count is denied.

Turning to UPMC Cole, to state a claim of medical negligence under a vicarious liability theory, Plaintiff must allege facts to show that UPMC Cole's agent, Dr. Hill: (1) owed a duty to Sparkman; (2) breached that duty; (3) that his breach was the proximate cause of the harm to Sparkman; and (4) that the damages suffered were a direct result of the harm.[83]

UPMC Cole argues that Plaintiff has not alleged that Dr. Hill owed any duty to Sparkman, that any duty was breached, nor that a breach of any duty caused Sparkman's suicide.[84] Plaintiff responds that he alleged Dr. Hill was contractually obligated to perform physicals on newly admitted inmates, that he did not perform a physical examination on Sparkman, and that his failure to do so resulted in Sparkman not receiving his medications or other medical attention that may have prevented his

---

[82]  *Woloszyn*, 396 F.3d at 320-21 (quoting *Colburn II*, 946 F.2d at 1024).

[83]  *Mitchell v. Shikora*, 209 A.3d 307, 314 (Pa. 2019); *see Holton v. United States*, No. 22-CV-0487, 2024 WL 2094014, at *2 (M.D. Pa. May 9, 2024).

[84]  Doc. 23 at 5-7.

suicide.[85] Plaintiff does not allege that Dr. Hill actually knew about Sparkman or his conditions before he committed suicide.

The contract between UPMC Cole and the Jail may create a duty of care owed to third parties like Sparkman.[86] But the terms of the contract, which Plaintiff included with his opposition to UPMC Cole's motion and the veracity of which neither party disputes,[87] do not support the existence of a duty as stringent as Plaintiff advocates. The contract does require that UPMC Cole's agent "perform physicals on newly committed inmates," but the agent is only required to "make at least one visit to the Jail per week as required by Pennsylvania State regulation."[88] Moreover, Pennsylvania law establishes a "minimum requirement[]" that, following an initial "health care screening" of newly admitted inmates, which can be "performed . . . by a person with health care training,"[89] the "prison health care provider" must perform "a medical history and physical examination . . . within *14 days following admission*."[90] The import of these requirements is that UPMC Cole owed a duty to Sparkman to provide a physical exam within fourteen days of his admission at the Jail.

---

[85]   Doc. 35 at 11-15.
[86]   *See Casselbury v. Am. Food Serv.*, 30 A.3d 510, 512-13 (Pa. Super. Ct. 2011).
[87]   *See Faulkner*, 463 F.3d at 134.
[88]   Doc. 35-2 (Agreement for Physician Services) ¶¶ 1(a), 1(d).
[89]   37 Pa. Code § 95.232(1).
[90]   *Id.* § 95.232(3) (emphasis added).

When Sparkman died on his fifth day of incarceration at the Jail, UPMC Cole had not breached this duty. Indeed, it was entirely possible for no agent of UPMC Cole to have visited the Jail *at all* during Sparkman's incarceration without breaching the contractual weekly visit requirement. That it appears from the complaint that Dr. Hill was at the Jail on the day of Sparkman's suicide makes no difference,[91] because, at that point, Pennsylvania law did not require him to perform Sparkman's physical for nine more days.[92] Dr. Hill (or another UPMC Cole agent) was contractually required to revisit the Jail before that deadline, and Sparkman's physical could have been legally performed at that time.

Because Plaintiff has not alleged that any UPMC Cole agent breached its duty to Sparkman, UPMC Cole is not vicariously liable on a theory of medical negligence.[93] Its motion to dismiss that count is accordingly granted.

## III.  CONCLUSION

For the above-stated reasons, UPMC Cole's motion to dismiss is granted, and Counselor Dovensky's motion to dismiss is denied.  Plaintiff is granted leave to amend. As such, Plaintiff will be given fourteen days from today's date to file an

---

[91] Doc. 1 ¶ 33.

[92] 37 Pa. Code § 95.232(3).

[93] The Court notes that this conclusion would appear to compel dismissal of Plaintiff's claims against Dr. Hill in his individual capacity. Dr. Hill has not answered the complaint or moved for dismissal, so he will not be dismissed at this time. However, if Plaintiff wishes to maintain his claims against Dr. Hill, he must make the basis of those claims clear in an amended complaint, if any. If Plaintiff declines to file an amended complaint, voluntary dismissal of Dr. Hill seems appropriate. Fed. R. Civ. P. 41(a).

amended complaint. If no amended complaint is filed, the claims against UPMC

Cole will be subject to dismissal with prejudice.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge