**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PAUL E. SPARKMAN, SR., *individually and as administrator of* THE ESTATE OF PAUL E. SPARKMAN, JR., | No. 4:24-CV-01338 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| POTTER COUNTY, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**OCTOBER 23, 2025**

## I.    BACKGROUND

On August 8, 2024, Plaintiff Paul E. Sparkman, Sr. filed a five-count complaint against a number of Defendants related to the Potter County, Pennsylvania Jail ("PCJ"). As relevant to the currently pending motions, the Defendants include the University of Pittsburgh Medical Center Charles Cole Memorial Hospital ("UPMC") and Dr. Aaron Hill ("Hill"), a doctor employed by UPMC who treated patients at PCJ on the night of the incident.

The claims in this case arise from the death of Plaintiff's son, Paul E. Sparkman, Jr. ("Decedent"), by suicide while incarcerated at PCJ. In essence, Plaintiff alleges that PCJ personnel failed to provide necessary medical care to his

son and thereby caused his suicide. He further alleges that Hill and UPMC were deficient in their care for him, leading to Decedent's unfortunate death.

Previously, UPMC filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[1] The Court granted UPMC's motion and dismissed Plaintiff's original complaint without prejudice, finding that Plaintiff had not sufficiently pled that UPMC or its agents breached a duty owed to Decedent.[2] After the Court ordered as much, Hill also filed a 12(b)(6) motion to dismiss,[3] which the Court denied as moot.[4] Plaintiff then filed an amended complaint[5] and now both UPMC and Hill have moved to dismiss this amended complaint under rule 12(b)(6) for failure to state a claim.[6]

The motions are now ripe for disposition. For the reasons that follow, UPMC's motion is denied, and Hill's motion is denied in part and granted in part.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[7] and

---

[1]    Doc. 13 (Mot. to Dismiss); Doc. 23 (Br. in Supp.).
[2]    Doc. 39 (Memo. Op.).
[3]    Doc. 41 (Mot. to Dismiss).
[4]    Doc. 51 (Memo. Op.).
[5]    Doc. 40 (Amend. Compl.).
[6]    Doc. 53 (Mot. to Dismiss, UPMC); Doc. 55 (Mot. to Dismiss, Hill).
[7]    550 U.S. 544 (2007).

*Ashcroft v. Iqbal*,[8] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[9] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[10]

When deciding a motion to dismiss, a court considers only the allegations in the complaint, exhibits attached thereto, and facts of public record.[11]  In this case, parties have both attached exhibits to their briefs, specifically including deposition testimony.[12] The depositions attached are neither integral to Plaintiff's complaint, nor explicitly relied upon inside the complaint, and will not be considered for purposes of the instant motions lest this stage devolve into a summary judgment proceeding.[13]

---

[8]    556 U.S. 662 (2009).

[9]    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

[10]    *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[11]    *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

[12]    Doc. 62 (Br. in Supp., UPMC); Doc. 66 (Br. in Supp., Hill); Doc. 71 (Br. in Opp. to UPMC); Doc. 76 (Br. in Opp. to Hill).

[13]    *Sube v. City of Allentown*, 974 F. Supp. 2d 754, 763 (E.D. Pa. 2013); *Rose v. Bartle*, 871 F.2d 331, 339 n.3 (3d Cir. 1989); *United States Express Lines*, 281 F.3d 383, 388 (3d Cir. 2002).

### B.    Facts Alleged in the Complaint

The facts alleged in the complaint, which this Court must accept as true for the purposes of this motion, are as follows.

On August 7, 2022, Decedent arrived at PCJ and went through the inmate intake procedure.[14] As part of this procedure, Decedent completed a variety of forms, including "Application for Defender Services," a "Pre-Acceptance Qualification Form," an "Inmate Classification Form," a "Receiving Screening Form," and a "Brief Jail Mental Health Screen."[15] On these forms, Decedent disclosed a host of mental health difficulties, including "post-traumatic stress disorder (PTSD), separation anxiety, ADD [(attention deficit disorder)], ADHD [(attention deficit hyperactivity disorder)], bipolar [disorder], intermittent explosive disorder (IED), and depression."[16] Decedent also stated that he was prescribed the antidepressants Wellbutrin (bupropion) and Remeron (mirtazapine), and the alpha-blocker Minipress (prazosin).[17]

On August 10, 2022, Registered Nurse Valerie Tinder ("Nurse Tinder"), a PCJ employee and Defendant, conducted a "Nursing Assessment" of Decedent as part of the intake process.[18] It appears that Decedent communicated his mental health

---

The Court finds that certain documents were explicitly relied upon in the complaint, including but not limited to Doc. 71-6 (Exhibit E – Agreement for Physician Services).

[14]   Doc. 49 (Amend. Compl.) at ¶¶ 18-21.

[15]   *Id.*

[16]   *Id.* at ¶ 18.

[17]   *Id.*

[18]   *Id.* at ¶ 23.

issues to Nurse Tinder.[19] He explained that he was under the care of "Dr. Nancy Allen" at a treatment facility called "New Beginnings," and provided contact information for both his doctor and her practice.[20] Decedent also informed Nurse Tinder that he had last filled his prescriptions for "Lexapro, Mirtazapine, and Wellbutrin on March 8, 2022—155 days earlier."[21] At the end of the Nursing Assessment, Nurse Tinder inexplicably checked "No" in the fields for "Psychiatric Problems," "Hospitalizations," "Psychiatrist," "Counselor," and "Suicidal Ideas Now" and "In Past," declined to refer Decedent to a counselor, and wrote that "[i]nmate denies any acute medical problems at this time."[22]

UPMC contracts with PCJ to provide certain medical care to inmates.[23] The contract requires UPMC to provide an on-site physician (or Physician's Assistant/Certified Nurse Practitioner) to PCJ at least once a week.[24] The physician's duties include "evaluat[ing] ill inmates," "perform[ing] physicals on newly committed inmates, trustees for kitchen duty and kitchen employees," and ordering necessary medications, among others.[25] Plaintiff pleads that UPMC did not provide specialized training to its physicians regarding their duties at PCJ, did not provide policies regarding suicide prevention or intervention to its treating physicians, did

---

[19] *Id.*
[20] *Id.*
[21] *Id.* at ¶ 26.
[22] *Id.* at ¶¶ 27-28.
[23] *Id.* at ¶ 9.
[24] Doc. 71-6 (Exhibit E – Agreement for Physician Services) at ¶ 1.
[25] *Id.*

not communicate with the PCJ warden to establish protocols for physician standards, and did not have in place any guidelines for how to triage patients.[26] Essentially, Plaintiff's complaint alleges that treating physicians at PCJ had virtually no oversight from UPMC.[27]

The physician assigned to PCJ on the evening of August 11, 2022 was Dr. Aaron Hill, Defendant in this case and a movant here.[28] Hill arrived at PCJ around 6:10 pm, and would have met with Nurse Tinder upon arrival that evening.[29] This meeting, and the information discussed therein, is crucial to the instant motions. Plaintiff pleads that, in that meeting, Nurse Tinder would have provided Hill with a schedule of patients for the evening, explaining to him each patient's medical history, list of medications, and her written nursing assessment.[30] Specifically, Plaintiff pleads that Hill "would have learned by approximately 6:15 pm that Sparkman was a new inmate who had treated with Dr. Allen at New Beginnings, and that he had been taking three anti-depressant, psychotropic medications, Lexapro, Mirtazepine, and Wellbutrin, last filled . . . on April 6, 2022 (Lexapro) and March 8, 2022 (Mirtazepine and Wellbutrin)."[31] Plaintiff specifically notes that Nurse Tinder did *not* share with Hill other information she had about Decedent, including: "(a)

---

[26] *Id.* at ¶ 31.
[27] *Id.*
[28] Doc. 49 (Amend. Compl.) at ¶ 37.
[29] *Id.* at ¶ 38.
[30] *Id.* at ¶¶ 38-39.
[31] *Id.* at ¶ 40.

diagnoses of PTSD, separation anxiety, ADD, ADHD, bipolar, IED, and depression; (b) that he wished to see the counselor soon; (c) that he was suffering from stress, depression, and anxiety."[32]

After the meeting, Nurse Tinder and Hill walked to the nearby examination room and asked a correctional officer to bring the inmates in "one by one, in the order that Nurse Tinder planned for Dr. Hill to see them, beginning around 6:15."[33] Between 6:15 and 6:30, Hill and Nurse Tinder examined patients other than Decedent.[34] None of the patients examined first had the same "grave concerns" that Decedent did, including not having access to psychotropic medications.[35]

Unfortunately, before Hill examined Decedent that evening, Decedent hanged himself in his cell sometime before 6:30 pm.[36] The correctional officer who discovered him retrieved Hill and Nurse Tinder, who attempted to perform CPR to no avail.[37]

Plaintiff initiated the instant suit to recover for his son's death. His amended complaint brings claims, as relevant to the moving defendants, for state law medical negligence and a violation of the Eight Amendment's ban on cruel and unusual

---

[32] *Id.* at ¶ 41.
[33] *Id.* at ¶ 42.
[34] *Id.* at ¶ 43.
[35] *Id.* at ¶ 43.
[36] *Id.* at ¶ 47.
[37] *Id.* at ¶¶ 47-48.

punishment.[38] He asserts his right to bring these claims under Pennsylvania's Wrongful Death and Survivorship Acts.[39]

### C.    Analysis

Plaintiff brings claims against Hill and UPMC for medical negligence, wrongful death, survival, and violations of Title 42 U.S.C. § 1983.[40] As a private corporation, UPMC is not a person under the Section 1983 statute and Plaintiff agrees that dismissal of this claim is proper for UPMC.[41] Accordingly, Defendant UPMC's motion to dismiss the Section 1983 claim is unopposed and granted.

Against UPMC remains the medical negligence claims and the attached wrongful death and survival claims. Against Hill remains the same in addition to the Section 1983 claim. Defendants UPMC and Hill have moved to dismiss these claims, and Hill has moved additionally to dismiss Plaintiff's claims of punitive damages against him.[42] I address first the medical negligence claims, then medical negligence's progeny (wrongful death and survival). I then move to the Section 1983 claim and finish with punitive damages.

---

[38]  *Id.* at ¶¶ 82-85, 103, 111, 114.
[39]  *Id.*
[40]  *Id.* at ¶¶ 28-40.
[41]  Doc. 71 (Br. in Opp. to UPMC) at 13-14.
[42]  Doc. 53 (Mot. To Dismiss, UPMC); Doc. 55 (Mot. To Dismiss, Hill); Doc. 66 (Br. in Supp., Hill) at 17-18.

### 1.    Medical Negligence

Plaintiff's claim of medical or professional negligence requires him to prove that 1) Defendant owed a duty to a patient; 2) Defendant breached that duty through an "unwarranted departure from the generally accepted of medical practice"; 3) that the breach was the direct and proximate cause of the harm suffered, and; 4) that the damages suffered were a direct result of the harm.[43] Plaintiff claims medical negligence against UPMC directly, against UPMC vicariously through Hill, and against Hill directly.[44] I analyze first UPMC's direct liability, then jointly analyze UPMC's vicarious liability and Hill's direct liability, as those claims rise and fall together.

### a.    UPMC's Direct Liability

In his amended complaint, Plaintiff has added a direct negligence claim for UPMC's "corporate negligence."[45] "A hospital, or other medical provider, may be held directly liable for its own 'institutional' negligence if it fails in its nondelegable duty to uphold the proper standard of care it owes to a patient."[46] This direct theory

---

[43]   *See Doe v. Hospital of Univ. of Pa.*, 546 F. Supp. 3d 336, 344-45 (E.D. Pa. 2021); *Hickey v. Merritt-Scully*, No. 18-CV-1793, 2022 WL 883851, at *7 (M.D. Pa. Mar. 24, 2022).

[44]   Doc. 49 (Amend. Compl.) at ¶¶ 101, 103, 105, 108.

[45]   Doc. 49 (Amend. Compl.) at ¶ 108.

[46]   *Estate of Goldberg v. Nimoityn*, 193 F. Supp. 3d 482, 492 (E.D. Pa. 2016) (citing *Thompson v. Nason Hosp.*, 527 Pa. 330, 339 (1991)).

9

of liability appears on its face to be a mere negligence claim, but it is also a medical negligence claim.[47]

Pennsylvania law decrees that "the hiring, training, supervising, and monitoring of employees who assist with the care and treatment of a health care professional's patients is considered an integral part of providing professional services" and, accordingly, negligent hiring or supervision claims stemming from medical acts should be treated as medical negligence.[48] Therefore, the same elements of medical negligence as described above apply, and Plaintiff must show that UPMC breached their duty by deviating from the acceptable professional standard for similar healthcare providers.[49] Additionally, to establish a breach of institutional duty, Pennsylvania law requires a plaintiff to prove that the healthcare provider had "actual or constructive knowledge of the defect or procedures which created the harm and that the hospital's negligence was a substantial factor in bringing about the harm."[50]

---

[47] *See Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 322-23 (Pa. Super. Ct. 2007) (defining medical malpractice as the "unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, *including all liability-producing conduct* arising from the rendition of professional medical services.") (emphasis added) (internal quotation omitted). In determining whether a claim sounds in medical negligence, courts look to two characteristics: whether the action could only occur within the course of a professional relationship and whether the claim necessarily raises questions involving medical judgment. *See Doe*, 546 F. Supp. 3d at 345.

[48] *Ditch*, 917 A.2d at 322; *Doe*, 546 F. Supp. 3d at 344-45 (collecting Pennsylvania cases).

[49] *See id.*

[50] *Estate of Goldberg*, 193 F. Supp. 3d at 492. Unless a hospital's negligence is "obvious," expert testimony will be required to establish breach and the substantial factor components of an institutional duty claim. *Id.*

First, Plaintiff must plead that a duty arose, or attached, between UPMC and the Decedent. Healthcare providers operating in a manner other than the traditional hospital setting may still be charged with a duty to patients.[51] Pennsylvania has set out two methods for analyzing whether a duty attaches in healthcare-provider cases: application of relevant sections of the Restatement (Second) of Torts, or analysis of the *Althaus* factors.[52] The relevant provision of the Restatement (Second) of Torts, §324A, provides for liability as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.[53]

---

[51] *See Scampone v. Grane Healthcare Company*, 169 A.3d 600, 619 (Pa. Super. Ct. 2017) (finding a healthcare company had a duty of care to patients of a nursing home by contractually undertaking to manage their care); *Johnson v. Lutton*, 466 F. Supp. 3d 472, 476 (M.D. Pa. 2020) ("A hospital, therefore, may owe a non-delegable duty of care to its patient even if the hospital does not serve as a comprehensive health center.") (internal quotation omitted).

[52] *See Johnson*, 466 F. Supp. 3d at 476 (citing *Scampone v. Highland Park Care Center, LLC.*, 618 Pa. 363, 396 (2012); *see also Scampone v. Grane Healthcare Company*, 169 A.3d 600, 617 (Pa. Super. Ct. 2017). The *Althaus* factors include weighing "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 553 (2000). The *Althaus* factors are an alternative to the Restatement, "most relevant to the creation of new duties than the vindication of existing ones." *Alderwoods Pa. Inc. v. Duquesne Light Co.*, 630 Pa. 45, 66 (2014); *see also Ramsey v. Salvation Army*, No. 2:21-CV-557, 2023 WL 5098500, at *11 (W.D. Pa. June 9, 2023).

[53] Restatement (Second) of Torts §324A. The Restatement (Second) of Torts §323 is similar, but applies when the provider treats directly with the patient, or owes the duty directly to him,

Despite Plaintiff's addition of a direct liability claim against UPMC, all parties' briefings lack any legal analysis on whether a duty arose between UPMC and decedent under these standards.[54] At this point, however, the Court finds that Plaintiff has pled sufficient facts to plausibly create a duty between UPMC and the patients in the PCJ. Specifically, the Court finds it plausible, based on the pleadings, that the Restatement (Second) of Torts §324A has been met: UPMC undertook to provide care to patients, it should have recognized this undertaking as necessary to the protection of patients' wellbeing, and this duty was owed to the patients by PCJ and shared through contract to UPMC.[55]

Given that a duty plausibly arose between UPMC and Decedent, the subsequent question is what, specifically, that duty entails and whether Plaintiff has pled it through to completion. Plaintiff sets out four alleged duties that UPMC had to Decedent directly: 1) the duty to use reasonable care in the maintenance of safe

---

instead of through third person liability. Courts frequently cite these two provisions in determining whether a healthcare provider owed a patient the duty of care. *See, e.g.*, *McClure v. Parvis*, 294 F. Supp. 3d 318, 327-29 (E.D. Pa. 2018).

[54] *See* Doc. 62 (Br. in Supp., UPMC) at 10-11 (providing no legal support for why a duty should not arise between healthcare providers and patients); Doc. 71 (Br. in Opp. to UPMC) at 15-17 (providing no case law support or analysis on why a duty should be imposed between UPMC and Decedent in the "duty" section of his brief), 22-23 (spending one paragraph defending the entire corporate negligence claim with no support for imposing a duty); Doc. 77 (Reply Br., UPMC) at 3-6 (arguing that there could be no breach of duty or duty imposed, but failing to provide any legal support or analysis on either); Doc. 78 (Reply Br., Hill) at 2-3 (arguing there was no breach).

[55] Parties are encouraged to address the issue at summary judgment, but for purposes of this motion, Defendant UPMC has waived the argument by failing to support it with legal citations or analysis.

and adequate facilities and equipment; 2) the duty to select and retain only competent physicians; 3) the duty to oversee all persons who practice medicine within their walls (or the walls of PCJ) as to patient care; and 4) the duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.[56] For each duty theory, Plaintiff must plead facts to show that *that* duty was breached, and that the breach of *that duty* caused harm.[57] A theory that does not sufficiently plead each element will be dismissed.

First, Plaintiff claims that UPMC violated its duty to use reasonable care in the maintenance of safe and adequate facilities.[58] For this theory, Plaintiff has not pled that Decedent used or was harmed by unsafe facilities or equipment under the responsibility of UPMC. Nor has Plaintiff pled or explained why Defendant would be responsible for maintenance of PCJ's facilities where the injury at hand occurred. Therefore, this theory of duty is insufficiently pled and, accordingly, dismissed.

Plaintiff's next three duty theories work in tandem and, as such, I will address them together. Plaintiff alleges that UPMC fell below the professional standard of care in failing to select and retain competent physicians and in failing to oversee those physicians through the creation and enforcement of policies.[59] The Court

---

[56] Doc. 49 (Amend. Compl.) at ¶108. These are the four non-delegable duties that Pennsylvania law generally recognizes for hospitals. *See Estate of Goldberg*, 193 F. Supp. 3d at 492, *Thompson*, 591 A.2d at 707.

[57] *See Perotti v. Festival Fun Parks, LLC*, No. 2:19-CV-1176, 2021 WL 3173463, at *1 (W.D. Pa., July 21, 2021) (citing *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 27-28 (Pa. 2006)).

[58] Doc. 49 (Amend. Compl.) at ¶ 108.

[59] Doc. 49 (Amend. Compl.) at ¶ 108.

believes that what Plaintiff is pleading here is that had UPMC hired a competent

doctor instead of Hill[60], or had Plaintiff created and enforced policies for patient

care[61], the treating doctor would have gone directly to Decedent[62] which would have

prevented Decedent's death.[63]

Plaintiff certainly could be more explicit in tying these causal chains together

through effective pleading. However, at this point, Plaintiff has pled sufficient facts

to raise an expectation that discovery will reveal evidence of the elements of his

claim.[64] Plaintiff has pled that UPMC was under contract with Potter County to

provide medical care to PCJ prisoners.[65] Plaintiff has pled that UPMC did not

provide Hill with training for his work at PCJ nor with any policies about suicide

prevention.[66] Plaintiff has pled that Hill was underqualified to be providing medical

care.[67] Plaintiff has pled that Hill should have but did not immediately attend to

Decedent based upon the information provided at his arrival to PCJ.[68] Plaintiff has

pled, albeit indirectly, that this delay in attending to Decedent stemmed either from

---

[60]   Doc. 49 (Amend. Compl.) at ¶ 30 (noting that Hill was not board certified).
[61]   Doc. 49 (Amend. Compl.) at ¶¶ 31-32, 103 (f).
[62]   Doc. 49 (Amend. Compl.) at ¶ 103 (g), (h), (i); Doc. 71 (Br. in Opp. to UPMC) at 20-21.
[63]   Doc. 49 (Amend. Compl.) at ¶¶ 43-46, 103 (g), (h), (i); Doc. 71 (Br. in Opp. to UPMC) at 20-21.
[64]   *Lutz v. Portfolio Recovery Associates*, 49 F.4th 323, 328 (3d Cir. 2022); *Fought v. City of Wilkes-Barre, Pennsylvania*, 466 F. Supp. 3d 477, 508 (M.D. Pa. 2020).
[65]   Doc. 49 (Amend. Compl.) at ¶ 9.
[66]   *Id.* at 31.
[67]   *Id.* at ¶¶ 30-32
[68]   *Id.* at ¶¶ 38, 43-44.

Hill's lack of qualifications or the lack of policies in place by UPMC.[69] Finally, Plaintiff has pled that Decedent would still be alive but-for Hill's delay in attending to him.[70] These pleadings meet the elements of medical negligence against UPMC: duty, breach, cause, harm.

Additionally, Plaintiff has pled sufficient facts to establish that UPMC had constructive notice of its alleged breaches of duty, as is required under this theory of liability.[71] Given that UPMC employed Hill, the Court can reasonably infer that UPMC should have been aware of his qualifications. Moreover, UPMC is on constructive notice of its own lack of policies.[72] Therefore, Plaintiff has pled sufficient facts to be "entitled to develop a factual record to support the applicability of the corporate negligence theory to [Defendant]."[73] Accordingly, Defendant UPMC's motion to dismiss is DENIED for the direct medical negligence claims.

---

[69]    *Id.* at ¶¶ 28-36, 103(g), (h), (i), (f).

[70]    Doc. 49 (Amend. Compl.) at ¶¶ 43-46, 86, 103 (g), (h), (i); Doc. 71 (Br. in Opp. to UPMC) 20-22.

[71]    *See Estate of Goldberg,* 193 F. Supp. 3d at 492.

[72]    *Graham v. Barolat*, No. 03-CV-2029, 2004 WL 2668579, at *5 (E.D. Pa. Nov. 17, 2004) (explaining that a hospital is deemed to be on constructive notice where its failure to have an adequate policy in place or enforce an otherwise acceptable policy caused the injury); *Rauch v. Mike-Mayer*, 783 A.2d 815, 828 (Pa. Super. Ct. 2001) (holding that "constructive notice must be imposed when the failure … is caused by the absence of supervision.").

[73]    *McClure v. Parvis*, 294 F. Supp. 3d 318, 329 (E.D. Pa. 2018). Whether the alleged fifteen-minute delay in attending to Decedent is a breach of the appropriate professional standard of care, and whether UPMC's negligence was a "substantial factor" in bringing about Decedent's harm, are questions that discovery and expert testimony will reveal. *See Munoz v. Children's Hospital of Philadelphia*, 265 A.3d 801, 806 (Pa. Super. Ct. 2021) (noting that in medical malpractice cases, an expert must testify that the defendant deviated from acceptable standards of care and that the conduct increased the risk of the harm sustained. Then, the trier of fact determines whether that conduct was a substantial factor in bringing about the harm.).

### b.    Hill's Direct and UPMC's Vicarious Liability

"[T]raditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."[74] Parties do not dispute that Hill is an agent for UPMC and that his actions could make UPMC vicariously liable.[75] So, if Hill was medically negligent in the course of his employment, then so too was UPMC.

Upon first reading Plaintiff's amended complaint, it appeared that Plaintiff was pleading UPMC could be vicariously liable based on the actions of both Hill and Nurse Tinder.[76] The introductory section of Plaintiff's Brief in Opposition makes several allusions to this effect.[77] Curiously, though, Plaintiff abandons this theory of vicarious liability by the argument section, instead addressing only Hill's

---

[74] *Garafola v. Lackawanna Cnty. Corr. Care, Inc.*, No. 3:07CV2305, 2008 WL 4861992, at *3 (M.D. Pa. Nov. 6, 2008) (citing *Meyer v. Holley*, 537 U.S. 280, 285 (2003)).

[75] Doc. 62 (Br. in Supp., UPMC) at 7. In Hill's brief in support, he states that he was merely "filling in" for a colleague. Doc. 66 (Br. in Supp., Hill) at 3. The Court notes that whether Hill is an agent of UPMC or an independent contractor could change the legal analysis determining whether Hill's actions can impute liability to UPMC. *See Green v. Pa. Hosp.*, 633 Pa. 18, 29-30 (2015). However, by not contesting the agency of Hill, Defendant UPMC has waived this argument for purposes of the instant motion.

[76] *See* Doc. 49 (Amend. Compl.) at ¶ 33 (stating Nurse Tinder was "employed as a registered nurse at UPMC Cole at all material times when working several partial days each week at PCJ"); *id.* at ¶ 106 ("UPMC Cole is vicariously liable to Plaintiff for the acts and omissions of Nurse Tinder, who was acting as employee, agent and/or ostensible agent of UPMC Cole.").

[77] Doc. 71 (Br. in Opp. to UPMC) at 1 (naming Nurse Tinder as an "agent/employee" of UPMC); *id.* at 5 (naming Nurse Tinder in the subsection's heading); *id.* at 10 n.8 (stating Nurse Tinder was "employed as a registered nurse at UPMC Cole at all material times when working several partial days each week at PCJ.").

negligence.[78] Indeed, Plaintiff even expressly disclaims this theory for the instant motion, stating that "Nurse Tinder was employed as a registered nurse at UPMC Cole during the time she served as the PCJ nurse, including on August 10-11[,] 2022, and her agency as well as UPMC Cole's vicarious liability for her (in addition to Dr. Hill) *will be questions for another day*, after the parties have engaged in full discovery."[79] The Court is not sure what day Plaintiff is waiting for, given that UPMC's vicarious liability is for its agents the main question of the instant motion.

Taking a closer look at Plaintiff's amended complaint, Plaintiff did not state sufficient facts to support the conclusion that "UPMC Cole is vicariously liable to Plaintiff for the acts and omissions of Nurse Tinder, who was acting as employee, agent and/or ostensible agent of UPMC Cole."[80] The complaint states that Nurse Tinder was "employed as a registered nurse at UPMC Cole at all material times when working several partial days each week at PCJ"[81] but, notably, Plaintiff does not make any connection between UPMC's employment of Nurse Tinder and her job at PCJ.[82] For instance, Plaintiff does not plead that Nurse Tinder was under contract

---

[78]  *Id.* at 11 (Stating the question presented as UPMC's vicarious liability "for its employee/agent, Dr. Hill"); *id.* at 14 (only addressing Hill as an agent of UPMC); *id.* at 15-22 (analyzing only agency liability for Hill).

[79]  *Id.* at 19 (emphasis added).

[80]  Doc. 49 (Amend. Compl.) at ¶106.

[81]  *Id.* at ¶ 33

[82]  To support a claim of vicarious liability as an agent, plaintiff "must allege facts that, if proved, would establish that the alleged agent had express, implied, or apparent authority to act on behalf of the principal." *Simmons v. Galin*, No. 97-CV-6151, 1999 WL 639843, at *2 (E.D. Pa. Aug. 23, 1999) (citing *Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.*, 412 Pa. Super.

with UPMC to go to PCJ, like Hill.[83] It appears that Nurse Tinder's employment at UPMC may have been entirely independent from and unrelated to her employment at PCJ.

Regardless, the Court need not address whether the facts as pled raise an inference of agency, as Plaintiff has expressly disclaimed the Nurse Tinder theory of vicarious liability.[84] The Court will not second guess that decision and, therefore, will proceed with Hill as the sole agent relevant to the vicarious liability inquiry.

Plaintiff's claim against Hill for medical negligence and for UPMC's vicarious liability rise and fall together, as the underlying analysis is the same for both. Accordingly, I address them together. The elements for medical negligence as recited above apply here: duty, breach of the professional standard of care, proximate cause, and harm.[85]

First, whether Hill owed Decedent any duty. Plaintiff has alleged that Hill had a duty of care to Decedent, namely the duty to "comply with generally accepted medical and mental health standards of care in their medical treatment of

---

[83]   140, 146-47 (Pa. Super. Ct. 1992)). Plaintiff has not alleged facts beyond that Nurse Tinder was employed at both places simultaneously.

[83]   The absence of this connection is stark when contrasted with the similar pleadings of Hill's involvement. Compare Doc. 49 (Amend. Compl.) at ¶ 10 ("Defendant Aaron Hill, M.D. . . . was, at all relevant times, a non-board certified hospitalist physician under contract with UPMC Cole who was assigned to work at PCJ") with ¶ 11 ("Defendant Valerie Tinder, RN . was, at all relevant times, a registered nurse who was working under contract at PCJ.").

[84]   Doc. 71 (Br. in Opp. to UPMC) at 19.

[85]   *See Doe*, 546 F. Supp. 3d at 344-45; *Hickey v. Merritt-Scully*, 2022 WL 883851, at *7.

Sparkman."[86] Duty is the stickiest legal question in this case. Under Pennsylvania law, the question of whether a duty attached is a legal one for the Court to decide, while the scope of that duty is generally a factual question for the jury.[87] There are two avenues for attaching a duty between Hill and Decedent in this case: first, the responsibilities enumerated in the contract between PCJ and UPMC; second, the duties imposed on Hill arising under the independent doctor-patient relationship.

Beginning with the duties imposed on Hill under the contract between PCJ and UPMC, the Court finds the analysis from the previous motion to dismiss largely the same.[88] Plaintiff points repeatedly to the contract between PCJ and UPMC as a basis for imposing duties on Hill.[89] The Court will accept that the contract imposes some duties on Hill. Specifically, Plaintiff pleads that the contract creates a duty to administer a patient physical within a set number of days of admittance[90] and a duty to prescribe medications.[91] Neither of these two avenues ultimately survive a motion

---

[86] Doc. 49 (Amend. Compl.) at ¶ 102.

[87] *K.H. v. Kumar*, 122 A.3d 1080, 1096 (Pa. Super. Ct. 2015) (noting that whether a duty attaches is a separate inquiry from "the precise contours of what care was appropriate under the circumstances of that case. Rather, we addres[s] the particular standard of care and the doctor's satisfaction thereof as a question of fact.").

[88] Doc. 39 (Memo. Op.) at 18-19.

[89] Doc. 49 (Amend. Compl.) at ¶¶ 10, 103; Doc. 76 (Br. in Opp. to Hill) at 15-18. Doc. 71 (Br. in Opp. to UPMC) at 15-18. Hill argues in his brief in support that he was not a party to the contract between UPMC and PCJ and, therefore, cannot be bound by the duties imposed in that contract. Doc. 66 (Br. in Supp., Hill) at 9. Defendant's point is well taken. However, because the Court finds that no theory of duty arising from the contract supports a viable claim for medical negligence, the point is moot and shall not be decided here.

[90] Doc. 49 (Amend. Compl.) at ¶ 103; Doc. 76 (Br. in Opp. to Hill) at 16-18; Doc. 54 (Answer to Amend. Compl.) ¶ 37.

[91] Doc. 49 (Amend. Compl.) at ¶ 103 (l). Plaintiff has not pled that this contract imposes a general duty to abide by the accepted medical standard of care.

to dismiss. Indeed, Hill was under a duty to conduct a patient physical within a set number of days of admittance, but as the Court previously discussed in its memorandum opinion, there was no breach of this duty.[92] Additionally, assuming for a moment that Hill was in breach of his duty to prescribe medications to Decedent, Plaintiff has not explained how that breach caused Decedent's death. Even if Hill had prescribed medication immediately upon receiving Decedent's file, Plaintiff has not pled that these medications would have been delivered to Decedent within the fifteen-minute interval, nor that the medications would have been effective during that time. Moreover, Plaintiff has not pled facts indicating a duty between Hill and Decedent arose before Hill arrived at PCJ that evening that would have required him to prescribe medication earlier. Therefore, neither of these contractually-imposed duty theories can support the weight of a full negligence claim. The duty to provide a physical does not survive past breach, and the duty to prescribe medication crumbles at causation, if not earlier.

---

[92]    Doc. 39 (Memo. Op.) at 18. In briefing, Plaintiff argues that the inmate physicals ought to have been conducted within seven days of admittance and points out that a visit on Thursday, August 18 would have occurred four days late. Doc. 76 (Br. in Opp. to Hill) at 16. Decedent was admitted on August 7 and died on August 11. Doc. 49 (Amend. Compl.) at ¶¶ 17-18. The Court fails to see how Hill was somehow in breach of the policy by having Decedent's physical scheduled for August 11, and certainly does not see the relevance of the August 18 date. Regardless of whether the physical needed to happen within seven days of admittance or fourteen, Hill was not yet in breach when Decedent passed away four days after admittance. Moreover, Plaintiff has not pled or effectively argued why the contractual duty to give Decedent a physical within seven days provides a duty to see Decedent first that evening.

Next, the Court turns to the more general doctor-patient duty. A physician has a duty to their patient to exercise reasonable medical care.[93] The duty arises at the "inception" of a physician-patient relationship.[94] At this point, Plaintiff has pled facts sufficient to indicate that a doctor-patient relationship could have existed on August 11. Plaintiff has pled that Hill was responsible for providing healthcare services to inmates and arrived at PCJ on August 11th to do so.[95] Plaintiff has pled that Hill was "scheduled" to see certain patients,[96] and that Decedent was one of the patients Hill was scheduled to see.[97] Plaintiff has pled that Nurse Tinder would have informed Hill of some of Decedent's history, including his treatment at New Beginnings and that he was prescribed (but did not have access to) anti-depressant, psychotropic medications.[98] From these pleadings, there was plausibly a doctor-patient relationship between Hill and Decedent. Indeed, that Hill had reviewed some of Decedent's history/file and was scheduled to see him minutes later weighs in favor

---

[93] *Munoz v. Child.'s Hosp. of Phila.*, No. 1388-EDA-2024, 2025 WL 1504354, at *17 (Pa. Super. Ct. May 27, 2025); *K.H. v. Kumar*, 122 A.3d at 1097.

[94] *K.H. v. Kumar*, 122 A.3d at 1097. The exact moment of onset for a doctor-patient relationship is not widely discussed in Pennsylvania law. *See White v. Cornish*, No. 1806-EDA-2014, 2015 WL 1641517, at *5 (Pa. Super. Ct. Apr. 13, 2015) (analyzing cases from other jurisdictions about onset of doctor-patient relationship based on a phone call conversation). Language in one Pennsylvania Superior Court opinion suggests that factors to consider in this determination are whether a doctor examines the patient, reviews his records, or anticipates a physician-patient relationship. *See id.* Similarly, language from the neighboring state of New Jersey suggesting the onset occurs when a doctor "takes a case." *See Schueler v. Strelinger*, 43 N.J. 330, 344 (1964).

[95] Doc. 49 (Amend. Compl.) at ¶¶ 10, 38.

[96] *Id.* at ¶ 38.

[97] *Id.* at ¶¶ 39-43.

[98] *Id.* at ¶ 40.

of finding the relationship existed. Hill "took" Decedent's case—the contractual obligation to see patients left him no choice but to do so. Accordingly, Plaintiff sufficiently pleads that Hill, as a medical practitioner, was under "a duty to comply with generally accepted medical and mental health standards of care" in treating Decedent.[99]

As Plaintiff has plausibly pled that Hill had a duty to Decedent, the Court will turn briefly to the other elements. Plaintiff has pled that Hill breached this duty of care in a variety of ways, including his delay in attending to Decedent.[100] Plaintiff has also pled that the delay in attending to Decedent, among various other deficiencies, caused Decedent's death.[101] At this stage, the Court must accept allegations as true and draw inferences in the light most favorable to Plaintiff. In doing so, the Court finds Plaintiff's medical negligence claim against Hill plausible.

---

[99] Doc. 49 (Amended Compl.) at ¶ 102. The difference between this duty and the contractual duties analyzed in the preceding paragraph is how the duty arises and the breadth of its scope. A duty arising through contractual obligations includes only the responsibilities in that contract as pled, while a more general duty arising under an independent doctor-patient relationship can be breached by violating the standard of care. The litany of deficiencies that Plaintiff alleges in paragraph 103 of his amended complaint may very well fall under this general duty if they are required by the appropriate standard of care. In this framework, deficiencies such as those alleged in paragraph 103 should be analyzed under breach rather than duty. The Court believes that this framework most closely aligns with Pennsylvania law and guidance. *See K.H. v. Kumar*, 122 A.3d 1080, 1097 (Pa. Super. Ct. 2015).

[100] Doc. 49 (Amended Compl.) at ¶¶ 43, 103 (g), (h), (i). The Court need not accept as true conclusory allegations, but this allegation has some logical support. The Court finds it plausible that failing to prioritize urgent patients over non-urgent ones could be a breach of the medical standard of care. Accordingly, the issue of whether Defendant Hill breached his duty of care is for discovery, expert testimony, and a jury if necessary.

[101] Doc. 49 (Amend. Compl.) at ¶¶ 43-46, 103 (g), (h), (i); Doc. 71 (Br. in Opp. to UPMC) at 20-21.

Accordingly, the medical negligence claims against Hill and, vicariously, UPMC survive, and Defendants' motions to dismiss are denied.

### 2.    Wrongful Death and Survival

Plaintiff has also brought claims under the Pennsylvania Wrongful Death and Survival Statutes.[102] These claims rise and fall with the underlying tort alleged; a plaintiff must state a valid claim for the predicate tort to state a claim for survival or wrongful death.[103] Parties are in agreement about this correlation—Defendants argue only that the medical negligence claim has not been met and that, therefore, Plaintiff has not successfully plead these claims either.[104] Because Plaintiff has stated a valid medical negligence claim against UPMC and Hill, so too has he stated valid wrongful death and survival claims. Accordingly, Defendants' motions will be denied on these claims.

### 3.    Section 1983

Title 42 U.S.C. § 1983 provides a procedural vehicle for private plaintiffs to enforce the Constitution when they suffer violations under color of state law.[105] To plead a Section 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

---

[102] 42 Pa. C.S. §§8301 and 8302, respectively. Doc. 49 (Amend. Compl.) at ¶¶109-112; 113-115.
[103] *Simmons v. Simpson House, Inc.*, 259 F. Supp. 3d 200, 209 (E.D. Pa. 2017).
[104] Doc. 62 (Br. in Supp., UPMC) at 11-12; Doc. 66 (Br. in Supp., Hill) at 18-19.
[105] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).

deprivation was committed by a person acting under color of state law."[106] Plaintiff contends that Decedent's Eighth Amendment right to be free from cruel and unusual punishment was violated when he was provided with such deficient medical care that he committed suicide.[107]

The Eighth Amendment to the United States Constitution prohibits infliction of "cruel and unusual punishments."[108] "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."[109] "A particular vulnerability to suicide represents a serious medical need."[110] The Third Circuit has established a framework for analyzing Eighth Amendment deliberate indifference to medical needs claims in the context of prison suicides. To make out an Eighth Amendment claim, "a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that

---

[106] *West v. Atkins*, 487 U.S. 42, 48 (1988). Defendant Hill does not contest that he was acting under color of law enforcement, and, accordingly, the Court will not analyze that question now. Doc. 66 (Br. in Supp., Hill) at 11-13.

[107] Doc. 76 (Br. in Opp. to Hill) at 20-22.

[108] U.S. CONST. AMEND. VIII.

[109] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, & Stevens, JJ.))

[110] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) ("*Colburn II*")).

vulnerability, *and* (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability."[111]

The Court need not decide the first element, because the claim fails plainly on the second and third elements.[112] Beginning with the second element, Plaintiff must plead that Defendant knew or should have known of an inmate's particular vulnerability to suicide.[113] The Third Circuit has explained this element as such:

> "[S]hould have known," . . . is a phrase of art with a meaning distinct from its usual meaning in the context of the law of torts. It does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk. The "strong likelihood" of suicide must be "so obvious that a lay person would easily recognize the necessity for" preventative action[;] the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.[114]

---

[111] *Colburn II*, 946 F.2d at 1023 (citing *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988) ("*Colburn I*")) (emphasis added)

[112] The Court notes that there is some consternation in the Pennsylvania jurisprudence over what, exactly, a particular vulnerability to suicide requires. *See* Doc. 39 (Memo. Op.) at 12 n. 62. Precedent indicates that a plaintiff may be required to plead that the inmate had recently stated his desire to commit suicide or had actually attempted to do so. *See, e.g., Bingham v. Lancaster Cnty.*, 709 F. Supp. 3d 176, 185-86 (E.D. Pa. 2024) (plaintiff was particularly vulnerable to suicide when he "had attempted suicide twice before his July 17 death and had exhibited suicidal ideation on at least three separate occasions . . . [and] [h]is two most recent instances of suicidal ideation occurred in the days before his death"). It is clear, at least, that a showing of particular vulnerability requires a "strong likelihood, rather than a mere possibility" that an inmate will harm himself. *Id.* at 185. Regardless, the Court need not analyze the question here and continues without deciding whether Decedent had a particular vulnerability to suicide.

[113] *Colburn II*, 946 F.2d at 1023.

[114] *Colburn II*, 946 F.2d at 1025 (internal citations omitted).

To find as much, the probability of suicide need be apparent to any person with similar education to the defendant.[115]

Plaintiff's claims fall far short of this standard. The facts as pled by Plaintiff indicate that Nurse Tinder was told that Decedent 1) treated previously at a different mental health facility; 2) was prescribed anti-depressant, psychotropic medications; and 3) had not had his medications refilled.[116] Plaintiff specifically pleads that Nurse Tinder *would not have shared* with Hill "other available information in Sparkman's records, including: (a) [his] diagnoses . . . (b) that he wished to see the counselor soon; (c) that he was suffering from stress, depression, and anxiety."[117] Many people, especially criminal defendants, have a history of mental health treatment.[118] This, combined with the fact that Decedent was out of his medication, does not give rise to a situation so dire that the risk of suicide should have been obvious to any medical practitioner. The information provided to

---

[115] *Estate of Kempf v. Wash. Cnty.*, No. 15-CV-1125, 2018 WL 4354547 at *15 (W.D. Pa. Sept. 12, 2018) (citing *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003)).

[116] Doc. 49 (Amend. Compl.) at ¶ 40.

[117] *Id.* at 41. In his brief in opposition, Plaintiff argues that discovery would shed light on "any other information [Nurse Tinder] may have shared, such as [Decedent's] anxiety, depression, and bipolarism." Doc. 76 (Br. in Opp. to Hill). However, this is flatly inconsistent with the pleading, where Plaintiff states that Nurse Tinder *did not* share that information with Hill. Doc. 49 (Amend. Compl.) at ¶ 41.

[118] Plaintiff only pleads that Nurse Tinder told Hill that Decedent was "a new inmate who had treated with Dr. Allen at New Beginnings." Doc. 49 (Amend. Compl.) at ¶ 40. This at most implies that Hill knew Decedent had been seen psychologically before by a medical provider. It says nothing about the tenor of his medical treatment or the extent of his psychological needs.

Hill is not enough to establish that any doctor should have immediately recognized an obvious danger of suicide, and, therefore, Plaintiff's claim fails.

Turning to the third element, to establish a claim for a Section 1983 violation, Defendant must have acted with reckless or deliberate indifference toward Plaintiff's specific vulnerability.[119] Reckless or deliberate indifference means something "beyond mere negligence."[120] Plaintiff's main contention in support of this claim is that Hill did not overrule Nurse Tinder's order of viewing patients that evening.[121] However, based on the limited information he received, Hill was not deliberately or recklessly indifferent to a particular vulnerability of suicide by not going to see Decedent first.[122] Plaintiff's pleadings are insufficient

---

[119] *Colburn II*, 946 F.2d at 1023.

[120] *Palakovic v. Wetzel*, 854 F.3d 209, 224 (3d Cir. 2017).

[121] In his brief in opposition of Hill's motion, Plaintiff again changes course from the pleading and argues that Hill may have ignored Nurse Tinder's suggestion that he go to Decedent first. Doc. 76 (Br. in Opp. to Hill) at 23. This is contrary to Plaintiff's pleadings, where he states expressly that Nurse Tinder established the order of seeing patients and claims that Hill's deficiency was merely failing to change this order. Doc. 49 (Amend. Compl.) at ¶ 44. In considering a Rule 12(b)(6) motion to dismiss, courts consider only the information contained in the pleadings, not facts that debut in the briefs. *See* FED. R. CIV. P. 12(b)(6); *Elliot v. Pa. Interscholastic Athletic Ass'n., Inc.*, 486 F. Supp. 3d 838, 843 (M.D. Pa. 2020) (Brann, J.). I will take Plaintiff's allegations in the pleading as true over the characterization of those facts in his brief.

[122] Specifically, Plaintiff's pleadings establish that Nurse Tinder set the schedule and contend that Defendant was deficient in not affirmatively overriding that order. Doc. 49 (Amend. Compl.) at ¶¶ 38, 42. The Court finds unpersuasive Plaintiff's implication that Defendant Hill should have asked *more* questions to determine if a patient was in crisis when Nurse Tinder had the patient information and, presumably, would have shared any known news of urgent patients without prompting from Hill.

to establish something more than mere negligence and, accordingly, Defendant

Hill's motion to dismiss is granted for this claim.[123]

### 4.    Punitive Damages:

In his complaint, Plaintiff requested to recover punitive damages for each

count.[124] Preliminarily, punitive damages are not recoverable under the Wrongful

Death Act.[125] Accordingly, Plaintiff's claim for punitive damages as a theory of

recovery for wrongful death will be dismissed for all Defendants.

Defendant Hill has moved to dismiss Plaintiff's claims for punitive damages

relevant to him.[126] Punitive damages are awarded to punish a defendant for

"outrageous conduct."[127] This is defined as either "an evil motive or reckless

indifference to the rights of others," including intentional, willful, wanton, or

---

[123] Plaintiff cites this Court's decision in *McGarry v. Yeager* for the contention that the issue of reckless indifference ought to be decided by the jury. *See* Doc. 76 (Br. in Opp. to Hill) at 26; No. 24-CV-01829, 2025 WL 1311914, at *18 (M.D. Pa. May 6, 2025). *McGarry*, while similar, is distinguishable to the case at bar in that Defendants were "concededly aware of [decedent's] suicidal tendencies" as the decedent had threatened to commit suicide several times in the days leading up to his death. *Id.* In *McGarry*, this Court found the allegations of misconduct sufficiently serious to send to a jury the question of whether failure to act "in response to an *unambiguous* and *urgent warning* of serious consequences" was recklessly indifferent. *Id.* This is not the case here, as Plaintiff's claim is wholly implausible on the facts as pled.

[124] Doc. 49 (Amend. Compl.) at ¶¶ 91, 100, 108, 112, 115.

[125] *Amesbury v. CSA, Ltd.*, No. 10-CV-1712, 2014 WL 279724, at *8 (M.D. Pa. Jan. 23, 2014).

[126] Doc. 66 (Br. in Supp., Hill) at 16-18. Defendant UPMC has not moved to dismiss this theory of recovery and, accordingly, the Court will not do so *sua sponte* now. UPMC may raise the issue at subsequent proceedings including summary judgment.

[127] *Lomas v. Kravitz*, 130 A.3d 107, 128 (Pa. Super. Ct. 2015).

reckless conduct.[128] The "reckless" mental state in the punitive damages context requires a showing that Defendant consciously disregarded a known risk of harm.[129]

For largely the same reasons that Plaintiff's Section 1983 claim was insufficient, this claim fails too; Plaintiff has not pled facts to support a finding of reckless indifference. There is simply no allegation that Hill was aware of a serious risk of harm to the defendant.[130] Without such an allegation, under Pennsylvania law, Plaintiff's complaint does not state a claim for punitive damages. Accordingly, Defendant Hill's motion to dismiss is granted in this regard, and Plaintiff's claim for punitive damages against him will be struck.

## III.    CONCLUSION

Defendant UPMC's motion to dismiss is GRANTED with prejudice for the Section 1983 claim but DENIED for the medical negligence claim, the wrongful death claim, and the survival claim. Defendant Hill's motion to dismiss is GRANTED with prejudice for the Section 1983 claim and for punitive damages

---

[128] *Id.* (citing *J.J. DeLuca Company, Inc. v. Toll Naval Associates*, 56 A.3d 402, 415-16 (Pa. Super. Ct. 2012).

[129] *Stroud v. Abington Memorial Hosp.*, 546 F. Supp. 2d 238, 257 (E.D. Pa. 2008) (citing *Hutchinson ex. Rel. Hutchinson v. Luddy*, 582 Pa. 114, 123-24 (2005).

[130] The closest Plaintiff comes to alleging as much is arguing that Hill did not take measures that *would have* informed him of the risk. Doc. 76 (Br. in Opp. to Hill) at 20-21 ("[Hill] was not actively involved with Sparkman's care because he consciously disregarded the need to activate such care."). However, even construing this argument generously, nowhere in the factual pleadings does Plaintiff offer support for the contention that Hill realized and appreciated a serious risk of harm to the Decedent. Indeed, the complaint as the Court reads it stands at most for the proposition that Hill *should have been aware* of such a risk. That is insufficient to meet the standard for punitive damages as described *supra*.

but DENIED for the medical negligence claim, the wrongful death claim, and the survival claim. Accordingly, Plaintiff's Section 1983 claims against UPMC and Hill are dismissed with prejudice. All of Plaintiff's punitive damages claims against Hill, in addition to the wrongful death punitive damages claim against all Defendants, are dismissed with prejudice.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge